Regina A. DAUGHTRY, Petitioner,

v.

Kathleen DENNEHY, Respondent.

Civil Action No. 95–12338–WGY.

United States District Court,
D. Massachusetts.

Oct. 21, 1996.

John J. Bonistalli, Law Offices of John J. Bonistalli, Boston, MA, for Petitioner.

Ellyn H. Lazar, Attorney General's Office, Boston, MA, for Respondent.

## MEMORANDUM OF DECISION

YOUNG, District Judge.

### I. Introduction

Convicted by a Massachusetts jury of first degree murder, Regina A. Daughtry ("Daughtry") is presently serving a life sentence. After exhausting all available state court remedies, Daughtry now petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C.A. §§ 2241 and 2254 (West 1994).

### II. Statement of Facts

With appropriate deference to the fact-finding role of the courts of the Commonwealth, 28 U.S.C.A. § 2254(d) (West 1994), the following facts may be gleaned from the voluminous record of this case:

#### A. *The Trial*

On June 29, 1991, Daughtry attended a party in Boston. At some point, Daughtry left the party with Christopher Jenkins ("Jenkins") and the two walked to the corner of Elm Hill Avenue and Hutchings Street. A group of young people were hanging out further down Elm Hill Avenue. A shot came from the corner where Jenkins and Daughtry were standing. It struck Angela Clayton ("Clayton") in the head, killing her. *Commonwealth v. Daughtry*, 417 Mass. 136, 139, 627 N.E.2d 928 (1994) (Nolan, J.).

Daughtry was indicted for first degree murder by a Suffolk County grand jury on September 9, 1991. Trial commenced before the Honorable James D. McDaniel, Jr. in the Massachusetts Superior Court on August 10, 1992. The Commonwealth's primary theory at trial was that Daughtry, accompanied by Jenkins, shot into the crowd intending to kill Ernest Polite ("Polite") whom she believed to be in the crowd, but killed Clayton instead. *Id.* at 137, 627 N.E.2d 928. The Commonwealth introduced ample evidence to warrant a jury conviction on this theory and Daughtry does not now contend otherwise. Indeed, Jenkins testified for the Commonwealth that Daughtry had fired the gun. *Id.* Defense counsel ably and professionally cross-examined Jenkins, raising the inference that it was he, and not Daughtry, who had been the shooter.

After the close of all the evidence, the Commonwealth, apparently impressed by the power of the cross-examination, asked that the case be submitted to the jury on the alternative theory that, while Jenkins had fired the shot which killed Clayton, Daughtry could nonetheless be convicted as a joint venturer. Memorandum of Law in Support of Respondent's Opposition to Petition for Writ of Habeas Corpus ("Respondent's Opposition") at 2. In instructing the jury on the applicable law, the trial justice included an instruction on joint venture. *Daughtry*, 417 Mass. at 137, 627 N.E.2d 928. The jury returned a verdict of guilty of murder in the first degree. Reviewing the matter on appeal, the Supreme Judicial Court concluded that, "[v]iewing the evidence in the light most favorable to the Commonwealth ... there was sufficient evidence of joint venture to warrant the jury in convicting [Daughtry] on that basis." *Id.* at 139, 627 N.E.2d 928.

## B. *The "Elevator Incident"*

Closing arguments and jury instructions took place on August 17, 1992 and, pursuant to Massachusetts practice, Mass.R.Crim.P. 20(d), the trial justice randomly selected four alternates from the sixteen-member empaneled jury which he held in reserve.[1] The twelve deliberating jurors then commenced their deliberations.

One of the alternates failed to appear for jury service on the first full day of deliberations and, after a hearing at which the juror and counsel were present, she was excused from the jury but was assessed one hundred dollars in court costs. There were then twelve deliberating jurors and three alternates.

On August 19, 1992—the second full day of deliberations—the jury requested that the court reinstruct them on joint venture, which the court did. The jurors continued their deliberations. At the end of deliberations on that day, one deliberating juror asked to be excused for medical reasons. The court excused the juror from further jury service, over the objection of defense counsel. *Daughtry,* 417 Mass. at 145–46, 627 N.E.2d 928. At that time, there were eleven deliberating jurors and three alternates.

On the following morning, August 20, 1992, the court received a telephone call from another deliberating juror who indicated that he had become ill during the previous night and that he did not wish to come into court. The trial justice was prepared to excuse this juror (as a result, there would have been ten deliberating jurors and three alternates remaining) when he was informed of yet further problems with the deliberating jurors.

On the morning of August 20, 1992, the third full day of jury deliberations, the foreperson of the jury notified a court officer of an incident which had occurred on the elevator as the jury was departing the prior eve-ning. The incident, which was witnessed by the forelady and other members of the jury, involved at least three young men who had been seated in the back of the courtroom behind Daughtry during the trial. As the jurors left the building on August 19, 1992, they were confronted in the elevator by the three men. One of the men said to a juror, "Would you push No. 1, you geek?" Transcript of Proceedings in the Superior Court, August 20, 1992, Volume 9 ("Tr. 9") at 12. The juror replied, "Oh, shut up," and was threatened. *Id.* at 12–13. The juror and the men exchanged words, *id.* at 12, and the altercation ended with one of the men saying to the juror "I'm going to get you," *id.* at 34, and calling the juror, "Casper, white ghost," *id.* at 37, before spitting on the elevator door, *id.* at 26, 34.

As a result of this information, the trial justice withdrew its discharge of the reportedly ill juror until it could question the jurors about the alleged incident and assess the composition of the remaining jury. At that point, then, there were again eleven deliberating jurors and three alternates.

The trial justice proceeded to question each juror individually concerning the elevator incident, under oath, outside the presence of other jurors. *Id.* at 12–68. The trial justice also questioned each juror concerning the impact of the incident on that juror's ability to deliberate fairly and impartially. *Id.* Each juror cognizant of the incident told a story similar to that of the foreperson. *Id.* Although certain of the jurors mentioned that they were bothered by the incident, all but two indicated that they remained fair and impartial and able to deliberate the case solely on the evidence and the law. *Id.* at 33–36, 55–59, 70; *see Daughtry,* 417 Mass. at 146, 627 N.E.2d 928. The judge excused the two jurors who declared that they were no longer impartial. *Daughtry,* 417 Mass. at 146–47, 627 N.E.2d 928.

---

1. Under Massachusetts practice, twelve unanimous jurors are necessary to return a verdict in a criminal case. Mass.R.Crim.P. 20(d). If a deliberating juror must be excused, an alternate juror may be substituted and deliberations may start again from the beginning. *Id.* This case well illustrates the wisdom of the Massachusetts practice.

Federal practice, in contrast, requires the "discharge" of the alternate jurors once jury deliberations begin, Fed.R.Crim.P. 24, though it may be acceptable to "discharge" alternate jurors but hold them in reserve (like Massachusetts practice) if they are kept strictly separated from the deliberating jury. *See United States v. Houlihan,* 92 F.3d 1271, 1288 (1st Cir.1996).

This left eight deliberating jurors and three alternates. The juror who had called in sick was brought into court. He told the court that he suffered from diarrhea and an upset stomach, but that he would make an effort to deliberate. With nine deliberating jurors ready for service, the three alternates were placed on the deliberating jury and, as reconstituted, twelve jurors began deliberations afresh. The jurors spent the remainder of August 20, 1992, deliberating. They resumed on the morning of August 21, 1992, and returned their verdict of guilty of murder in the first degree at 10:30 a.m. on that day.

## C. *Post-trial Proceedings*

Daughtry was sentenced to a mandatory term of life imprisonment. A motion for new trial was filed with the trial justice in the Massachusetts Superior Court and subsequently denied on January 19, 1993. Daughtry then appealed her conviction and the denial of the motion for new trial to the Supreme Judicial Court of Massachusetts, which affirmed both Daughtry's original conviction and the denial of her motion for new trial. *Daughtry*, 417 Mass. at 137–39, 627 N.E.2d 928.

In her fifty-three page Memorandum in Support of Petition for Writ of Habeas Corpus ("Petitioner's Memorandum"), Daughtry presents five grounds for relief. First, Daughtry maintains that the Commonwealth withheld evidence favorable to her. Second, she insists that the Commonwealth failed to acknowledge a benefit, reward, or inducement given to Jenkins, its primary witness. Third, she alleges that she was not afforded fair and reasonable notice of the precise charges against her and, in any event, she asserts that the evidence presented at trial was insufficient for any rational jury to find her guilty of joint venture premeditated murder. Finally, Daughtry contends that she was deprived of her Sixth Amendment right to a fair and impartial jury by the circumstances surrounding the deliberations in her case.

The Commonwealth moved to dismiss this petition on the grounds that review of one of Daughtry's claims is precluded by procedural default in the state court, and that none warrant federal *habeas corpus* relief. At a hearing before this Court on May 15, 1996, the Court heard arguments from both parties and took the matter under advisement. The Court ordered the petition denied on September 25, 1996. This memorandum of decision explains that ruling.

## III. Analysis

### A. *Withholding Exculpatory Evidence*

Daughtry maintains that her rights to due process and a fair trial were violated by the Commonwealth's withholding of evidence favorable to her before the trial commenced. Specifically, Daughtry alleges that her rights were violated by the Commonwealth's failure to inform her that (1) the testimony of one witness, Raquel Phillips ("Phillips"), would differ from the evidence earlier disclosed by the Commonwealth on the issue of Daughtry's clothing on the morning after the murder, and (2) that Polite had stated in an earlier interview that he was not at the murder scene at the time of the shooting.

The Supreme Judicial Court declined to grant Daughtry relief on this basis, concluding that "the Commonwealth never possessed any of the evidence which the defendant asserts was suppressed." *Daughtry*, 417 Mass. at 143, 627 N.E.2d 928. The court further stated that the "Commonwealth provided Daughtry with all witness statements in its possession soon after obtaining them," that there was "no evidence that the Commonwealth failed to provide Daughtry with any exculpatory evidence in its possession" and that, to the extent that witness testimony differed from prior statements, "there [was] no indication that the Commonwealth knew of the content of the witnesses' new testimony prior to trial." *Id.* at 144–45, 627 N.E.2d 928. The Petitioner's Memorandum sets forth not one iota of evidence to impugn these factual recitations by the Supreme Judicial Court, choosing instead to reiterate conclusory allegations of prosecutorial misconduct.

■ Factual conclusions by a state court may be disregarded in *habeas* proceedings only upon a showing that the factual determi-

nation is not supported by the record. 28 U.S.C.A. § 2254(d)(8) (West 1994). That showing has not been made here. Furthermore, in order to obtain relief under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), Daughtry must show that the evidence allegedly withheld by the prosecution was both exculpatory and material, since "*Brady* error occurs when the prosecution suppresses 'material' evidence that is favorable to the accused." *Gilday v. Callahan*, 59 F.3d 257, 267 (1st Cir.1995) (citing *Kyles v. Whitley*, — U.S. —, —, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 [1995] ), *cert. denied*, — U.S. —, 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996). In *Kyles*, the Supreme Court defined exculpatory evidence as material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." — U.S. at —, 115 S.Ct. at 1565 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 [1985] ).[2]

Here, had Daughtry been told prior to trial that Phillips would testify as she did, there is no reasonable probability that Daughtry's trial result would have been any different. In fact, Daughtry's counsel called Phillips to the stand to testify as to what Daughtry was wearing on the morning after the murder. Phillips' testimony, which contradicted that of two witnesses for the prosecution, was in fact beneficial to Daughtry. It is difficult to imagine how earlier knowledge of Phillips' testimony would have changed the ultimate result of the trial.

The same conclusion holds with respect to Polite's testimony. Daughtry had been told of Polite's presence at the murder scene and there was testimony that Daughtry had stated that she would "get" Polite in revenge for an earlier knife incident. Polite, who was included on the prosecution's witness list, actually testified that he was not at the scene of the shooting and that he had been in Daughtry's presence without incident since the earlier alleged knife altercation. Although Daughtry contends that Polite's statements rebut the Commonwealth's theory that Daughtry had the motive to kill Polite, Polite's testimony does not meaningfully refute the evidence of motive. Other testimony placed Polite at the scene, explaining that he went inside minutes before the fatal shot was fired. The fact that Polite testified as to his absence from the scene at the time of the shooting fails meaningfully to exonerate Daughtry.

**B.** *Failure to Acknowledge Reward or Inducement*

Daughtry insists that the Commonwealth's failure to acknowledge a reward or inducement to Jenkins, its primary witness, prior to defense counsel's cross-examination of that witness improperly deprived her of her Sixth Amendment right to confrontation. She argues that "both the trial evidence and the prosecutor's eleventh hour change of focus point to one conclusion: [Jenkins] ... benefitted significantly as a result of his testimony against [Daughtry]." Petitioner's Memo-

**2.** Those who are aficionados of this sort of thing may seize upon the emphasis on "materiality" herein as inconsistent with the sweep of this Court's recent discovery orders in *United States v. Owens*, 933 F.Supp. 76, 85–90 (D.Mass.1996). There is no inconsistency. The *Owens* decision— and this Court's earlier attempt to wrestle with the same issues in *United States v. Kelliher*, Crim. No. 90–10269–Y, order from the bench (Transcript of October 21, 1991) at 78–105—are driven by the decisions of the First Circuit in *United States v. Devin*, 918 F.2d 280, 289–92 (1st Cir. 1990) and *United States v. Osorio*, 929 F.2d 753, 757–63 (1st Cir.1991), decisions which are binding on this Court but which have only persuasive force in the courts of the Commonwealth.

More important, the analytic framework established by *Brady, Bagley,* and *Kyles* speaks to the situation that arises post-trial when complaint is

made that exculpatory evidence has been withheld. This is the situation presented in the present case and the Court can undertake the familiar task of reflecting on the trial record as a whole in an informed and prudential manner.

*Kelliher* and *Owens*, in contrast, seek to give meaningful life to the *Brady,—Bagley—Kyles* constitutional mandate through appropriate pre-trial discovery orders. At that point, given the very nature of the adversary process, neither the government nor the defense, much less the Court, can say with any real certainty what ultimately will prove material. In the pre-trial situation, therefore, materiality is largely in the eye of the beholder. *Kelliher* and *Owens* seek to make sure some eye other than the government's will bear on that determination. This is not the situation here.

randum at 43. This appears to be so, but what of it?

 The Supreme Judicial Court concluded that there existed no evidence of promises, inducements, or rewards given Jenkins in exchange for his testimony. *Daughtry*, 417 Mass. at 144, 627 N.E.2d 928. It is Daughtry's burden to bring forth evidence to overcome the presumption that this factual conclusion is correct. *See* 28 U.S.C.A. § 2254(d) (West 1994). The only charge made by Daughtry in her Memorandum is that because Jenkins was never prosecuted, "there [had to be] (at a minimum) an implicit arrangement between [Jenkins] and the Commonwealth." Such an allegation, without more, is not enough.[3] Petitioner's Memorandum at 45. There is thus no entitlement to *habeas corpus* relief. *See Sumner v. Mata*, 455 U.S. 591, 597–98, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (holding that 28 U.S.C. § 2254[d] requires the federal courts to "face up to any disagreement as to the facts and to defer to the state court unless one of the factors outlined in § 2254[d] is found").

## C. *Deprivation of Notice*

Daughtry claims that the issue of joint venture should not have been presented to the jury because "it amounted to a variance from the charge for which she was indicted." Petitioner's Memorandum at 22. She thus contends that she was not afforded fair and reasonable notice of the precise charges against her in violation of her Sixth and Fourteenth Amendment rights to a fair trial and due process. The Commonwealth counters that Daughtry is in procedural default as

to this claim since she failed to raise any such objection during trial. The Commonwealth argues that this Court should not address this claim since Daughtry has not established cause for her default, prejudice arising therefrom, or that a review of her claim is required to prevent a fundamental miscarriage of justice.

 Daughtry's attorney failed to object to the presentation of a joint venture theory to the jury during the trial. The law within the First Circuit reflects the familiar standard laid down by the Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977). *See, e.g., Burks v. Dubois*, 55 F.3d 712, 717 (1st Cir.1995); *Puleio v. Vose*, 830 F.2d 1197, 1199 (1st Cir.1987), *cert. denied*, 485 U.S. 990, 108 S.Ct. 1297, 99 L.Ed.2d 506 (1988). It is well established that "a defendant's failure to object at h[er] original state trial may constitute an 'independent and adequate state procedural ground' sufficient to foreclose collateral federal review of claimed constitutional error." *Puleio*, 830 F.2d at 1199 (quoting *Wainwright*, 433 U.S. at 87, 97 S.Ct. at 2506). There is a limitation to the *Wainwright* rule, however, in that the state must have a contemporaneous objection rule, and the state court must not have waived it in the particular case by resting its decision on some alternate ground. *See Burks*, 55 F.3d at 716; *Puleio*, 830 F.2d at 1199; *McCown v. Callahan*, 726 F.2d 1, 3 (1st Cir.), *cert. denied*, 469 U.S. 839, 105 S.Ct. 139, 83 L.Ed.2d 78 (1984).[4]

Massachusetts has a contemporaneous objection rule that is routinely enforced and consistently applied. Mass.R.Crim.P. 22; *see*

---

3. Although this is the law, it may be inferred that at trial the government started out alleging Daughtry was the one who pulled the trigger but, after running headlong into a stout defense by her counsel, changed tack and turned to its fallback position. In its closing argument, the government—for the first time during the trial—told the jury that, although Jenkins might possibly have been the shooter, it was nonetheless possible to convict Daughtry of premeditated murder on a joint venture theory. One is left to ponder why Daughtry goes to jail for life, perhaps on a joint venture theory, and the man who may actually have pulled the trigger under such theory is never prosecuted.

4. If a state court rests its decision upon a finding of procedural default, for example a defendant's breach of an unwaived contemporaneous objection requirement, there can be no federal *habeas* review unless the petitioner can demonstrate (1) cause for the default and prejudice stemming therefrom ("cause and prejudice"), or (2) that a refusal to consider the merits of the constitutional claim will result in a miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991); *Burks*, 55 F.3d at 716 (citing *Coleman*, 501 U.S. at 729, 111 S.Ct. at 2553); *Puleio*, 830 F.2d at 1199 (citing *McCown*, 726 F.2d at 3).

*Burks,* 55 F.3d at 716 (citing *Puleio,* 830 F.2d at 1199); *Commonwealth v. Fluker,* 377 Mass. 123, 130–31, 385 N.E.2d 256 (1979). Daughtry, however, raised this issue for the first time in her appeal to the Supreme Judicial Court. *See Daughtry,* 417 Mass. at 141, 627 N.E.2d 928.

 Massachusetts law provides a saving grace for petitioners who fail to adhere to the contemporaneous objection rule. *See* Mass.Gen.Laws Ann. ch. 278, § 33E (West 1981). Section 33E provides that the Supreme Judicial Court may reach the merits of an appeal, notwithstanding procedural default, in order to determine whether a miscarriage of justice has occurred. *Id.* Where, as here, a state court reviews a claim to determine the presence of a substantial likelihood of a miscarriage of justice, the law is clear that the state court does not waive its enforcement of the contemporaneous objection rule. *See Tart v. Commonwealth,* 949 F.2d 490, 496 (1st Cir.1991); *McLaughlin v. Gabriel,* 726 F.2d 7, 9 (1st Cir.1984) (holding that "review of this sort does not automatically 'waive' the state's 'contemporaneous objection rule' ... because the state court in conducting it, does not generally seek to determine constitutional questions, but rather makes a determination of state law, namely, whether there has been a substantial likelihood of a miscarriage of justice"). In addition, the miscarriage of justice exception is designed to be one of narrow application, "seldom to be used, and explicitly tied to a showing of actual innocence." *Burks,* 55 F.3d at 717.

In reviewing Daughtry's claim, the Supreme Judicial Court specifically relied upon section 33E in addressing this issue, ruling that the indictment was "constitutionally sufficient to charge murder by whatever means committed." *Daughtry,* 417 Mass. at 142, 627 N.E.2d 928 (quoting *Commonwealth v. Robertson,* 408 Mass. 747, 749, 563 N.E.2d 223 [1990]). The court explicitly rejected Daughtry's assertion that she was not afforded reasonable notice of the nature and grounds of the offense charged, ruling that the Commonwealth presented sufficient evidence to the grand jury that Daughtry could have acted as an accomplice in the murder and that the Commonwealth responded to Daughtry's request for a bill of particulars prior to trial by stating that the manner and means of the crimes charged were "by any and all manner and means by which these crimes could be committed." *Id.* In addition, the court noted that Daughtry's counsel at trial "anticipated the Commonwealth's joint venture argument in his closing," which occurred prior to the Commonwealth's closing. *Id.*

 Daughtry's argument essentially boils down to an assertion that her counsel was caught unawares that the Commonwealth would present a joint venture theory to the jury at trial because it was not presented to the grand jury prior to indictment, thus depriving her of any "advance notice" that she would be tried as a joint venturer. Petitioner's Memorandum at 24–25. While Daughtry's attorney may consider the prosecution's tactics unfair, his failure to object at trial is fatal to this claim. Furthermore, there was enough evidence presented to the grand jury to support a joint venture theory and Daughtry was provided with minutes from the grand jury prior to trial. *Daughtry,* 417 Mass. at 142, 627 N.E.2d 928. Daughtry has failed to show that the cause for her attorney's failure to object at trial related to "an objective factor, external to the defense, that thwarted (or at least substantially obstructed) the efforts of the defendant or his counsel to obey the state's procedural rule." *Burks,* 55 F.3d at 716–17 (citations omitted). No such showing of an external factor was offered, and, as mere attorney error is insufficient to constitute cause, *see Scarpa v. Dubois,* 38 F.3d 1 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 940, 130 L.Ed.2d 885 (1995), this claim must fail as matter of law. *See Burks,* 55 F.3d at 717 ("If inadvertence of counsel, without more, were deemed to constitute sufficient cause, the cause requirement would be reduced to little more than a speed bump on the road to a federal forum").

### D. *Sufficiency of the Evidence*

Daughtry contends that, whatever the ruling on the notice issue, as matter of constitutional law there was insufficient evidence

for any rational jury to convict her on a theory of joint venture premeditated murder. Petitioner's Memorandum at 28–41; Transcript of Hearing on *Habeas Corpus* Petition, May 15, 1996, ("Motion Tr.") at 19–20.[5] Daughtry's primary objections were that the government failed to afford Daughtry due process (1) because there was insufficient evidence to convict Daughtry on a joint venture theory, and (2) because the government waited until such a late stage of the case to raise the joint venture allegation. Motion Tr. at 20. In rebuttal, the Commonwealth argues—quite naturally—that there was sufficient evidence to convict Daughtry as a joint venturer.

■■■ When a claim of insufficient evidence is raised in a petitioner's claim for *habeas corpus,* the critical inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found evidence sufficient to prove the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). The *Jackson* standard, although questioned in a recent First Circuit case, *see Stewart v. Coalter,* 48 F.3d 610, 613 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995), must nonetheless be applied here. *Jackson* requires an independent, *de novo* review of the evidence, 443 U.S. at 319, 99 S.Ct. at 2789, with the curious result that federal judges "effectively substitute themselves for state judges in deciding whether a judgment of acquittal is warranted in a state criminal case for lack of adequate evidence." *Stewart,* 48 F.3d at 613. Furthermore, in applying the *Jackson* standard, "explicit reference must be made to the substantive elements of the criminal offense as defined by state law." *Jackson,* 443 U.S. at 324 n. 16, 99 S.Ct. at 2791 n. 16; *see Campbell v. Fair,* 838 F.2d 1, 4 (1st Cir.), *cert. denied,* 488 U.S. 847, 109 S.Ct. 126, 102 L.Ed.2d 100 (1988).

■■■ Massachusetts defines the crime of first degree murder—of which Daughtry

was convicted—as "[m]urder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty...." Mass.Gen.Laws Ann. ch. 265, § 1 (West 1990). Malice aforethought includes both the intent to commit great bodily harm as well as the intent to kill. *Commonwealth v. Campbell,* 378 Mass. 680, 686, 393 N.E.2d 820 (1979). Under Massachusetts law, a joint venturer is "one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime." *Commonwealth v. Soares,* 377 Mass. 461, 470, 387 N.E.2d 499, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). A joint venturer may be punished to the same extent as a principal if she "aids in the commission of a felony." Mass.Gen.Laws Ann. ch. 274, § 2.(West 1990). It is possible for one to be deemed a joint venturer even if not participating in the actual perpetration of the crime if, by agreement, she is positioned to render aid, "[f]or the presence of the abettor under such circumstances, must encourage and embolden the perpetrator to do the deed, by giving him hopes of immediate assistance." *Commonwealth v. Knapp,* 26 Mass. (9 Pick.) 496, 518 (1830), *quoted in Soares,* 377 Mass. at 472, 387 N.E.2d 499. Finally, "[t]he jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Soares,* 377 Mass. at 470, 387 N.E.2d 499.

■■■ Daughtry argues that "none of the evidence presented at trial supported a finding that [Daughtry] and [Jenkins] shared the requisite state of mind to be guilty of joint venture premeditated murder." Petitioner's Memorandum at 29. In addition, Daughtry argues that the joint venture theory "patently conflicted" with the prosecution's theory of the case. *Id.* Disposing of the second contention is fairly simple, so it shall be addressed first. It is at least logical for the prosecution to reassess its own case as it progresses and decide, in good faith, to present an alternate theory of the case to the jury. An argument that one theory "patent-

---

5. Daughtry's attorney conceded, however, that there was sufficient evidence presented at trial to convict Daughtry on the prosecution's primary

theory that Daughtry herself fired the fatal shot. Motion Tr. at 19.

ly conflicts" with the prosecution's primary theory completely ignores the fact that, under Massachusetts law, the language on the indictment form used to indict Daughtry—which tracks the language provided in Mass. Gen.Laws Ann. ch. 277, § 79 (West 1994)—is constitutionally sufficient to charge murder in the first degree by any means it may be committed. *See Commonwealth v. Robertson,* 408 Mass. 747, 749, 563 N.E.2d 223 (1990). Murder by joint venture is one of those means. Furthermore, a trial judge may instruct the jury on a theory of joint venture regardless of whether the prosecutor requests it or not, if sufficient evidence exists. *Commonwealth v. Iacono,* 20 Mass. App.Ct. 83, 86, 478 N.E.2d 144 (1985).

■ The contention that there was insufficient evidence to support Daughtry's conviction on a joint venture theory requires a reexamination of the relevant facts as presented at trial. While the Supreme Judicial Court amply summarized the evidence necessary to convict Daughtry, *see Daughtry,* 417 Mass. at 139–40, 627 N.E.2d 928, and while "[a] judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts," *Jackson,* 443 U.S. at 323, 99 S.Ct. at 2791, this Court is obliged to analyze this issue anew for potential constitutional violations, *see Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *see also* 28 U.S.C.A. § 2254(a) (West 1994).

The relevant facts concerning Daughtry's and Jenkins' participation in Clayton's murder, taken in the light most favorable to the prosecution, are as follows: Several weeks prior to the night of the murder, Daughtry was threatened with a knife by Polite. Several witnesses testified at trial that Daughtry stated shortly before the night of the murder that she was "going to get" Polite. There was also evidence that Jenkins had a vendetta against members of a local gang, the "Steelers," because his cousin had allegedly been shot in the leg by a member of that gang. On the night of the murder, Clayton was surrounded by a group of acquaintances, including Polite and at least one member of the "Steelers," Anthony Green.

Daughtry and Jenkins were longtime friends. On the night of the murder they were talking and dancing together at a party. Daughtry had a nine-millimeter semi-automatic revolver with her at the party. Jenkins testified that, on the day before the murder, he saw a man give a gun to Daughtry, and saw her carrying a gun at the party. Another friend at the party noticed that Daughtry had a bulge beneath her shirt and, after attempting to hug Daughtry, was told not to "touch anything." At some point during the party, Daughtry walked outside and was told that Polite was sitting with a group of people on another street in the neighborhood. Daughtry re-entered the party and asked Jenkins to accompany her to the area where Polite had been observed. Jenkins asked Daughtry if she had the gun, and she responded, "Yo. Just come on."

Both of them then left the party and walked together to the corner of the street where Polite was sitting. One witness saw Daughtry pass something to Jenkins as the two walked away from the party. One shot from a nine-millimeter revolver was fired from the corner where Jenkins and Daughtry were standing. Witnesses near Clayton at the time of her death saw two individuals at the corner from where the shot came dressed similarly to what Jenkins and Daughtry were wearing that evening and with their same physical characteristics. There was further testimony that the person who fired the fatal shot had a build similar in width to that of Jenkins, that Daughtry was not the one who fired the shot and that Jenkins was accompanied by a person similar in build to Daughtry. After the shooting, Jenkins was seen running from the scene holding his arm down by his side. Daughtry ran from the scene with her shirt untucked, running so fast that she did not stop to answer when a friend asked her why she was running so fast. Daughtry and Jenkins later met at a friend's house, where Jenkins hid the gun under a bed. Both spent the night at the house.

■ Based on this evidence, a rational jury could have concluded that Daughtry was (1) present at the scene of the crime, (2) with knowledge that Jenkins intended to commit the crime, or (3) with the intent to commit

the crime herself and (4) by agreement was willing and available to help Jenkins if necessary. *See Commonwealth v. Bianco,* 388 Mass. 358, 366, 446 N.E.2d 1041 (1983). The same conclusion was reached by the Supreme Judicial Court in its analysis of the evidence. *Daughtry,* 417 Mass. at 140, 627 N.E.2d 928. Accordingly, this Court holds that upon the record evidence adduced at trial, a rational juror could have found beyond a reasonable doubt that Daughtry acted as a joint venturer to murder Clayton.

### E. *The Elevator Incident*

Daughtry first contends that she was deprived of her Sixth Amendment right to a fair trial by an impartial jury because of the elevator incident. Petitioner's Memorandum at 8–9. Specifically, she alleges that

> [t]he jurors were exposed to an extraneous influence during deliberations. The trial court then inquired, as to each juror individually, what influence it had on their deliberation process. Some of the jurors stated that the incident had affected their position. They were not impartial and indifferent, but agreed to remain on the jury after considerable persuasion by the trial judge.

Petition for Writ of *Habeas Corpus,* attachment at 2 ¶ e. Daughtry, however, does not offer any specifics on how the trial judge used "considerable persuasion" to entice the jurors who witnessed the elevator incident to remain on the jury, preferring to allege in general that the trial judge committed reversible error in "ask[ing] each juror whether he or she could still adjudge the case solely on the evidence and not on the extraneous information." Petitioner's Memorandum at 9.

■ The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right to a fair trial and an impartial jury. U.S. Const.Amend. VI.[6] It is well established that extraneous influences upon a jury constitute a violation of the defendant's Sixth Amendment rights:

Juror misconduct claims fall under two broad subheadings: juror bias and improper juror contacts. 'Both are at the core of the Sixth Amendment's right to a trial by an impartial jury, free from prejudicial contact. Private communications with a deliberating juror create the concern that the juror may reach a verdict on the basis of the matters communicated, rather than the trial evidence.'

*United States v. Gaston–Brito,* 64 F.3d 11, 12 (1st Cir.1995) (citing *United States v. Day,* 830 F.2d 1099, 1103 [10th Cir.1987] ). Claims of improper influence are analyzed "under the broad rubric of juror misconduct because the alleged incident created a risk that the jurors were prejudiced by facts not in evidence." *Id.* at 12. In federal courts, when there is the appearance that a jury may be biased or tainted by some incident, the trial judge "must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial." *United States v. Ortiz–Arrigoitia,* 996 F.2d 436, 442 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1368, 128 L.Ed.2d 45 (1994); *see also Gaston–Brito,* 64 F.3d at 12.

■ In *United States v. Angiulo,* 897 F.2d 1169, 1184 (1st Cir.1990), the First Circuit stated that "[t]he paradigmatic example of [prejudicial] *ex parte* contact with a juror is a threat, bribe, or statement containing prejudicial information made directly to a juror by a third party or stranger." Furthermore, "[a]ny unauthorized private communication between jurors and persons associated with the case is presumptively prejudicial, unless its harmlessness is or becomes apparent. Only communications between jurors and others which concern the case require further inquiry." *United States v. O'Brien,* 972 F.2d 12, 14 (1st Cir. 1992). In *O'Brien,* the jurors were approached during trial by a government witness. *Id.* at 13.

Although there is no evidence that the three men in the elevator were associated

---

**6.** The Sixth Amendment states, in relevant part, the following:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed....

U.S. Const.Amend. VI.

with Daughtry, and there is no testimony from any of the affected jurors that they believed the men to be associated with Daughtry, there can be no question that the elevator incident amounted to an extraneous influence upon the jury. The Supreme Judicial Court itself noted that the jurors "could have concluded" that the three men "were friends of [Daughtry]." *Daughtry*, 417 Mass. at 146, 627 N.E.2d 928.

Despite these concerns, however, inquiry into the influence, if any, of extraneous matters on the motives and deliberative process of a juror is never permissible. *Mahoney v. Vondergritt*, 938 F.2d 1490, 1492 (1st Cir.1991), *cert. denied*, 502 U.S. 1104, 112 S.Ct. 1195, 117 L.Ed.2d 436 (1992). When investigating influences upon the jury, "any investigation must focus solely on whether the jury was exposed to external influences and, from an objective perspective, whether such influence was likely to have affected the jury's verdict." *Id.* (citations omitted). In addressing this issue, the Supreme Judicial Court stated that "[t]he record reveals that the [trial] judge devoted considerable time and concern to each juror," and that "[t]he judge properly conducted individual questioning of each juror, outside the presence of the other jurors, to determine the extent of the juror's exposure to the incident, and its effect on the juror's ability to render an impartial verdict." *Daughtry*, 417 Mass. at 146–47, 627 N.E.2d 928. Furthermore, the independent review *de novo* by this Court, far from unearthing improper questioning or conduct by the trial justice, instead reveals that he handled this most difficult phase of the trial with complete impartiality and superb sensitivity. The trial justice spoke with each juror individually under oath and asked whether the juror recognized the men in the elevator, whether the incident affected the juror's ability to render a fair and impartial verdict, whether the juror could put aside the incident and deliberate the case on the evidence and law alone, and whether the juror had discussed the incident in the jury room. Tr. 9 at 14–63. The trial justice also instructed each juror not to discuss the incident upon returning to the jury room. *Id.* One wonders what else he might have done short of declaring a mistrial simpliciter.

This Court owes deference to the factual findings made by the trial court, as sustained or expanded upon by the appellate courts of the Commonwealth. These factual findings must be taken as correct unless the petitioner can come forward with strong evidence to rebut the presumption of correctness or unless there is absolutely no basis in the record to support them. 28 U.S.C. § 2254(d) (West 1994). In a *habeas corpus* proceeding, a state court's findings concerning whether extraneous matters affected jury deliberations "deserves a 'high measure of deference.' " *Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (quoting *Sumner v. Mata*, 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 [1982] ). The state court's conclusions on questions of juror partiality, like all factual findings, are presumed correct under 28 U.S.C.A. § 2254(d) (West 1994), especially because "[a] trial court's findings on issues of juror credibility and honesty are determinations 'peculiarly within a trial judge's province.' " *See Amirault v. Fair*, 968 F.2d 1404, 1405 (1st Cir.), *cert. denied*, 506 U.S. 1000, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 [1985] ). The constitutional standard of fairness requires only that jurors be impartial and indifferent, and here the trial justice made explicit findings that each retained juror stood indifferent. Tr. 9 at 16, 24, 27, 33, 38, 43, 51, 61, 64, 66, 68. These findings were examined anew by the Supreme Judicial Court of Massachusetts, and it found the trial justice's conduct to be proper. *Daughtry*, 417 Mass. at 147, 627 N.E.2d 928 ("The judge concluded that the remaining jurors were impartial and indifferent. He was in the best position to evaluate the juror's credibility. There was no abuse of discretion."). In sum, the inquiry of the jurors affected by the elevator incident was appropriate and adequately protected Daughtry's Sixth Amendment rights.

Still, no fair consideration of this appalling abuse of deliberating jurors can conclude with such summary treatment. As Wellington said of Waterloo, to deny habeas corpus on this aspect of the case "has been a damned serious business ... the nearest run thing you ever saw in your life." Thomas

Creevey, *The Creevey Papers* 142 (Sir H. Maxwell ed. 1904), *quoted in* Elizabeth Longford, *Wellington: The Years of the Sword* 489 (1969). One can, with equal plausibility, infer from the racially-charged epithets arising during the elevator incident that the deliberating jurors identified their abusers with Daughtry and thereby drew adverse conclusions against her. While this Court is bound by the state courts' fact-finding, it is vital to understand just how close this conviction comes to being set aside through abuse of the jury process.

It is well and properly said that the Massachusetts Superior Court "may well be the best jury trial court in America today," [7] *Brotherhood of Locomotive Eng'r v. Massachusetts Commission Against Discrimination*, 695 F.Supp. 1321, 1323 n. 1 (D.Mass 1988), yet Massachusetts inexplicably continues to rank almost last among the fifty states in providing adequate courthouses for its citizens and resources for its jurists. Agenda 90, Report to the Massachusetts Senate Ways and Means Committee (1987) (Table A); *see also Mele v. Fitchburg Dist. Ct.*, 696 F.Supp. 766, 769 n. 7 (D.Mass.1988) (describing how Massachusetts trial courts have had "to wrestle with frequently decrepit court facilities and crippling shortages of judicial personnel, support services, and educational resources"), *rev'd on other grounds*, 884 F.2d 5 (1st Cir.1989); E. Hennessey, *Twelfth Annual Report to the Bar*, 73 Mass.L.Rev. 8–9 (1988); *Courts in Crisis*, Mass.Bar Assoc.Jud.Admin.Sec.Newsl. (Special Issue Spring 1988). This Court is entitled to take judicial notice of adjudicative facts which are generally known within the community and are not subject to reasonable dispute. Fed. R.Evid. 201(b).[8] There is an endemic problem in the "new" courthouse for Suffolk County where this case was tried.[9] Three floors of that courthouse have been closed because people are unable to breathe, and suffer from a variety of nasal and eye irritations. Accordingly, certain civil sessions have been relocated to cramped offices in an adjacent state office building—separate from courthouse staff and files. While this is apparently not enough to engage the public interest or cause a public outcry, this case is a stark reminder that courthouses that require deliberating jurors to ride the same elevators as trial participants and observers are substandard in their very design and expose jurors to unnecessary security risks. *See* Don Hardenbergh et al., *The Courthouse, A Planning and Design Guide for Court Facilities* 84085, 106 (National Center for State Courts 1991) (stating that jury deliberation rooms should be accessible "by a private corridor," and that separate elevator systems should move the public, court staff and judges). As Chief Justice Wilkins has recently observed, "[Some courthouses are] just in such terrible shape that they ought not to be used—but relatively few of them are sufficiently attractive to create the impression in the minds of the public that society cares about what goes on there to provide adequate facilities." David L. Yas, *New Chief Seeks Better Legislative Relations*, Mass.Law.Wkly., Sept. 23, 1996, at A1, A35 (quoting Chief Justice Herbert P. Wilkins). Small wonder, then, that in Suffolk County, citizens properly summonsed to jury service stay away in droves. *See* Patricia Nealon, *Jury Pool No–Shows Delaying Cases, Suffolk County Crackdown Vowed*, Boston Globe, November 6, 1993 at Metro/Region. Dilapidated and unsafe courthouses are not just a civic eyesore that relegates Massachusetts to frayed elbow status in the national fabric, they may—as this case illustrates all too well—actually prevent the guilty from being brought to justice. Do the citizens of Massachusetts care?

### V. Conclusion

For the foregoing reasons, this Court concluded that Daughtry's habeas petition must be **DENIED**.

---

7. One need only examine the skillful handling of the present case by Justice McDaniel to understand why.

8. This Court may take judicial notice at any stage of the proceedings. Fed.R.Evid. 201(f).

9. This courthouse, built in 1938, is "new" only in relation to the "old" Suffolk courthouse, built in 1895. *Courthouses of the Commonwealth* 106, 119 (Robert J. Brink ed. 1984).