**Kenneth M. CONLEY, Petitioner,**

v.

**UNITED STATES, Respondent.**

**No. CIV.A.01–10853–WGY.**

United States District Court,
D. Massachusetts.

Aug. 18, 2004.

Robert S. Bennett, Thomas J. Dougherty, Saul M. Pilchen, Jonice Gray Tucker, Skadden, Arps, Slate, Meagher & Flom, LLP, for Petitioner.

S. Theodore Merritt, United States Attorney's Office, Boston, MA, for Respondent.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. BACKGROUND

This case presents for decision but a single, straight-forward question. It is this: Recognizing that "it is enough to show that [withheld] evidence undermines confidence in the verdict," *Conley v. United States*, 323 F.3d 7, 10 (1st Cir.2003), did the government's withholding of evidence in this case deprive Kenneth Conley of "a fair trial, understood as a trial resulting in a verdict worthy of confidence[?]", *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

I am not the first judge to address this question. The trial judge answered the question "yes," *United States v. Conley*, 103 F.Supp.2d 45, 58 (D.Mass.2000) and 164 F.Supp.2d 216, 223–24 (D.Mass.2001),[1]

and was removed by the Court of Appeals from any further consideration of the case.

One judge of the Court of Appeals (a distinguished trial judge in his own right) answered the question with an unequivocal "no." *Conley v. United States*, 323 F.3d at 31 (2003) (Torruella, J., dissenting). The matter having been remanded to the district court for a "fresh look," *id.* at 15, and having been randomly drawn to this session, it is my duty independently to answer the central question posed above.

## II. PRIOR PROCEEDINGS

In the early morning hours of January 25, 1995, Michael Cox ("Cox"), a Boston police officer, was savagely beaten by fellow officers who apparently mistook him for a suspect the officers were pursuing. Criminal charges were never filed against the attackers, although two officers were later held civilly liable to the victim [Doc. No. 420 in *Cox v. City of Boston*, No. 95–12729 (D. Mass. filed Dec. 18, 1995)].

In August 1997, a grand jury indicted Kenneth M. Conley ("Conley") for perjury and obstructing justice. In June 1998, Conley was convicted of one count of perjury (in testifying that he had seen no one else pursuing the suspect in question) and one count of obstructing justice. He was acquitted of the other perjury count (with respect to having testified that he did not witness the beating in question). Conley was sentenced to just under three years in prison, but that sentence was stayed, and—to date—Conley has not served any of this sentence.[2]

---

1. While the trial judge made plain his views concerning the fairness of Conley's trial, he never squarely framed the question as set forth above. I have the advantage of the opinions of the Court of Appeals for the First Circuit.

2. Although there may be interesting questions regarding whether Conley is in "custody" for purposes of 28 U.S.C. § 2255, the government has not raised them, nor have any of the courts that have considered Conley's Section 2255 motion mentioned them. Therefore, this Court need not address them.

On direct appeal, the First Circuit affirmed the conviction. *United States v. Conley*, 186 F.3d 7 (1st Cir.1999) (*"Conley I"*). Conley subsequently moved for a new trial in early 2000, identifying a number of pieces of new evidence he claimed were either newly discovered or wrongfully withheld. The trial judge discussed the new evidence at some length and, without determining whether there had been a violation under *Brady v. Maryland*, 373 U.S. 83, 89, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), ordered a new trial in "the interests of justice." *United States v. Conley*, 103 F.Supp.2d 45, 58 (D.Mass.2000) (*"Conley II"*).

On appeal, the First Circuit held that because the motion for a new trial was made more than seven days after the verdict, the district court could not use the general "interests of justice" standard in Rule 33 of the Federal Rules of Criminal Procedure. *United States v. Conley*, 249 F.3d 38, 46 (1st Cir.2001) (*"Conley III"*).

Conley then filed the instant habeas petition pursuant to 28 U.S.C. § 2255 and the district court granted the motion, setting aside the conviction and ordering a new trial. *Conley v. United States*, 164 F.Supp.2d 216, 223–24 (D.Mass.2001) (*"Conley IV"*). The district court found that the new evidence was so powerful that it would probably cause an acquittal on retrial under *United States v. Wright*, 625 F.2d 1017 (1st Cir.1980), but it never reached the *Brady* claim. *Conley IV*, 164 F.Supp.2d at 223. On appeal, a divided panel of the First Circuit again reversed the lower court, holding that in *Conley II*, the district court had decided that the *Wright* and *Brady* standards could not be

satisfied and that the First Circuit, in *Conley III*, declined to remand, ruling that the sentence should now be executed. The panel majority held that the lower court's ruling in *Conley IV* was therefore inconsistent with the law of the case, and it refused to address the merits of the *Wright* and *Brady* claims.

The *en banc* court then granted Conley's petition for rehearing and withdrew the panel decision. *United States v. Conley*, 323 F.3d 7, 11 (1st Cir.2003) (*"Conley V"*). The court held that "the law of the case doctrine has no application here and also that *Brady* but not *Wright* applies to [Conley's] new evidence claims made in [his] section 2255 motion." *Id.* The court vacated the lower court's decision and remanded to another district court judge for a "fresh look" "so that Conley can obtain a ruling on his *Brady* claim." *Id.* Judges Bownes and Torruella wrote dissenting opinions in which they argued that no remand was necessary because the appeals court could well decide the *Brady* issue at that point. *Id.* at 16–17 (Bownes, S.J., dissenting); *id.* at 23 (Torruella, J., dissenting). Indeed, Judge Torruella actually conducted the relevant *Brady* analysis, and he concluded that the evidence was immaterial under *Brady*. *Id.* at 30–32 (Torruella, J. dissenting).

Both the criminal and habeas cases were then remanded and randomly drawn to this session of the Court.[3]

## III. THE "FRESH LOOK" METHODOLOGY

Pursuant to the mandate of the First Circuit, this Court, in discharging its

---

**3.** Although both the habeas and criminal cases were drawn to this Court, presumably for reasons of administrative convenience, the criminal case is in effect closed, and the Court's opinion only addresses Conley's habeas petition. Conley's direct appeals have been exhausted, and after a complicated procedural odyssey, the denial of his Motion for a New Trial under Federal Rule of Criminal Procedure 33 is now final. *See Conley V*, 323 F.3d at 10–14. Conley never sought review of *Conley V* in the United States Supreme Court, and the deadline has long since expired.

duties, has done all those things one might reasonably expect—and two that are less usual.

First, the Court familiarized itself with the record and the opinions of the Court of Appeals, solicited further briefs, and carefully reviewed them. It then held a thorough hearing in which both parties were given ample opportunity to argue their respective positions. That's standard.

■ In view of the Court of Appeals' having removed the trial judge from any further proceedings in this case, however, this Court has consulted the trial judge's opinions only in a cursory manner, sufficient to understand the procedural setting, and has eschewed any reflection on the factual findings made by the trial judge. The Court adopted this approach to ensure that its own conclusions would be derived totally from independent research and reflection.

Finally, because the Court is faced with deciding as a matter of trial practice how the withheld evidence could have been used before the jury (and what confidence one may have in a verdict where this is not possible), I have taken the time—twice—to read the entire trial transcript from start to finish, just as the jury saw and heard it. This is quite different from even a thorough review of the copious appellate record, replete with various data and memoranda that the jury never saw. I first made this review during the quiet of an August vacation in 2003 and repeated it over the holidays at the end of that year when the Court was not sitting daily on trials. The Court formed a tentative conclusion from its first transcript review. The second confirmed that conclusion.

## IV. THE DATABASE

Before presenting the reasoning that leads the Court to its conclusion, however, it is necessary to set out in some detail the data that leads the Court to its conclusion.

### A. The Evidentiary Record

### 1. Evidence at Trial

In the early hours of January 25, 1995, after a homicide at a restaurant in Boston reportedly involving a police officer as a victim,[4] several Boston Police cruisers responded. The marked and unmarked cruisers pursued four black male suspects who had fled the scene in a gold Lexus. Trial Tr. I at 67–70. The suspects turned into a cul de sac in Mattapan known as Woodruff Way, came to a stop, and fled the car. *Id.* at 72. One of the suspects, Robert Brown ("Brown"), who was wearing a brown leather jacket, ran toward a fence on the right-hand side. *Id.* at 76–77.

The first police cruiser, occupied by Officer Cox, his partner Craig Jones ("Jones"), and a security guard, Charles Bullard ("Bullard"), who had accompanied the officers from the scene of the shooting, stopped to the left of the Lexus. *Id.* at 69; Trial R. II at 27–29. Cox, who is black, was clad in plain clothes, including jeans, a black hooded sweatshirt, and a black down jacket. Trial Tr. I at 65–66. Cox, the first witness at the trial, saw Brown exit the Lexus, and Cox immediately chased after him, "right behind him," directly to the fence. *Id.* at 76–77; Trial Tr. II at 30–31. Brown scaled the fence and his jacket caught momentarily at the top. Trial Tr. I at 77; Trial Tr. II at 95. Cox testified that he grabbed Brown's jacket in an attempt to pull him back over the fence, but Brown made it to the top and dropped

4. The report was later determined to be erroneous in that the victim was not a police officer.

down to the other side. Trial Tr. I at 78; trial Tr. II at 3–4.

As Cox prepared to climb the fence and continue the pursuit, he was struck from behind with a blunt object by other police officers who apparently mistook him for the suspect. Trial Tr. I at 85–87. The officers beat and kicked Cox repeatedly in the head, back, face, and mouth. *Id.* at 87–89; Trial Tr. II at 98–102. Cox heard an officer shout, "stop, stop, he's a cop, he's a cop," and the officers fled. Trial Tr. I at 88–89. Cox was seriously and permanently injured and had to be taken to the hospital for treatment. *Id.* at 94–95.

### 2. Conley's Earlier Grand Jury Testimony

In April 1997, a federal grand jury began investigating the beating to determine which officers were involved and whether excessive force had been used. Trial Tr. III at 114. It subpoenaed Conley to testify, which Conley did under the protection of statutory immunity.[5] As the First Circuit summarized in affirming Conley's conviction on direct appeal, Conley testified to the following:

> Consistent with Cox's version of events, Conley testified that when he arrived at the dead end on Woodruff Way, his vehicle was about the fourth or fifth police car in line behind the suspects' gold Lexus, approximately forty feet away.... Also consistent with Cox's account, Conley testified that once the Lexus skidded to a stop, a black male wearing a brown leather jacket exited from the passenger side of the Lexus and ran to the right, towards a fence. Conley exited his vehicle in pursuit. While in pursuit, Conley observed the

suspect scale the fence, drop down on the other side, and start to run....

Conley testified that he made all of these observations as he pursued the suspect, beginning from the time the suspect first exited the gold Lexus up to the time when the suspect landed on the other side of the fence and started to run. According to Cox's testimony, Conley made these observations at precisely the same time that Cox was chasing "right behind" the suspect.... However, before the grand jury, Conley testified that during that time he did not observe anyone—either in plain clothes or in uniform—between him and the suspect. In direct conflict with Cox's account, Conley testified as follows:

> . . . . .
>
> Q: Did you see anyone else in plain clothes behind him as he went towards the fence?
>
> A: No I didn't.
>
> Q: Did you see, as he went on top of the fence or climbed the fence, another individual in plain clothes standing there, trying to grab him?
>
> A: No I did not.
>
> Q: When you saw the suspect get to the top of the fence, did you see another individual in plain clothes grabbing part of his clothing—
>
> A: No I did not.
>
> Q: —as he went over the fence?
>
> A: No I did not.
>
> Q: So that didn't happen; is that correct? Because you saw the individual go over the fence?
>
> A: Yes, I seen [sic] the individual go over the fence.

---

5. Conley maintains that he was prepared to testify without immunity but that he took it on advice of counsel, and he takes issue with the government's characterization of his being "compelled" to testify. The fact that he was given immunity, however, is undisputed.

Q: And if these other things that I've been describing, a second—another plain clothes officer chasing him, and actually grabbing him as he went to the top of the fence you would have seen that if it happened is that your testimony?

A: I think I would have seen that. . . .

Conley further testified that when he got to the fence, he climbed over it in "approximately the same location" that he had observed the suspect go over the fence, and continued in pursuit. . . . Eventually, after chasing the suspect for approximately one mile, Conley apprehended him and effected an arrest.

*Conley I*, 186 F.3d at 12–13 (citations omitted).

### 3. Testimony of Cox, Walker, and Brown

At trial, the government adduced evidence that implicitly contradicted Conley's grand jury testimony. First, Cox testified that he ran "right behind" Brown to the fence and grabbed his jacket in an attempt to pull him back over the fence. Trial Tr. I at 77. Moreover, Cox testified that no one else was between him and Brown at any time. *Id.* at 85.

Walker, the second witness, testified that as his car pulled up to the scene, he saw Cox—whom he knew—running from left to right in close pursuit of a black male suspect approximately "three feet behind" him. Trial Tr. II at 30–31. Walker observed the suspect climb the fence and Cox reach for him. *Id.* at 76. After seeing the suspect drop to the other side of the fence, Walker ran straight ahead through a hole in the fence down a hill.

*Id.* at 34–35. He testified that, after falling twice, he ran toward where he thought the suspect ran, and saw two white plain clothes officers ahead of him in the street. *Id.* at 35–36. Walker stated that one officer was tall (approximately 6′2″) and that that officer asked Walker for a flashlight. The taller officer ran off in pursuit of the suspect and Walker ran after him. *Id.* at 36–37. The taller officer dropped his radio, which Walker returned to him after the officer captured the suspect. *Id.* Walker further testified that he would not recognize the tall officer, but agreed with defense counsel that "at all times the white officer who was about the same size as Ken Conley was in front of [Walker]." *Id.* at 66.

Brown testified that he saw a black man wearing black clothing running after him as he ran toward the fence and that he felt someone touch his foot as he attempted to scale the fence. *Id.* at 94, 96. After he scaled the fence, Brown ran into a tree and split his tooth.[6] *Id.* at 97. Dazed, Brown looked back toward the fence and saw a black man wearing a black hood begin to climb the fence. *Id.* Brown stated that he saw an officer strike the man in the hood and saw another officer beating the man. *Id.* at 98–101. As Brown stood up to flee, he testified that he made eye contact with a tall white officer on the other side of the fence who was standing next to the officers who were beating the man in the hood.[7] *Id.* at 102. Brown ran but was later caught and arrested by the same tall, white officer he had seen at the fence. Conley arrested Brown. *Id.* at 103–04, 239–41.

---

6. Conley points out that one of the pieces of *Brady* material not turned over was Brown's booking report that contains no mention of any injury.

7. In closing argument, the government argued that this officer was Conley, but the jury acquitted Conley of lying about not witnessing the beating.

## 4. Convictions Affirmed

The jury convicted Conley of perjury with respect to his testimony that he had not seen anyone behind Brown at the fence, but it acquitted him of perjury with respect to his testimony that he had not witnessed the beating. It also convicted him of one count of obstructing justice.

The First Circuit affirmed the convictions and stated that the testimony of Cox, Walker, and Brown constituted "ample circumstantial evidence" of Conley's guilt. *Conley I*, 186 F.3d at 19. The Circuit Court stated:

> By comparing Conley's testimony about the timing and location of his actions with the testimony of Cox, Walker, and Brown, the jury reasonably concluded that Conley lied when he stated that he did not observe Cox chasing the suspect. Conley testified that upon arrival at the scene, he observed Brown exit from the passenger side of the Lexus, run to the right, and climb over the fence. Most significantly, Conley testified that "within seconds of seeing [the suspect] go over" the fence he scaled the fence at the same location.
>
> Both Cox and Walker placed Cox at the exact same time at the exact same place where Conley claims to have climbed over the fence. According to their testimony, which we must view in the light most favorable to the verdict, Cox was "right behind" Brown, approximately three feet behind him, as Brown approached the fence. When Brown reached the fence, Cox was even closer. At that point, Cox was close enough to make contact with Brown and attempt to pull him back over the fence. Brown corroborated this version of events when he testified that a black man wearing a "black hoody" was behind him as he ran toward the fence and had just started to come over the fence after him when he

observed the black man being struck on the head by a police officer. Brown confirmed that the person behind him was close enough to make contact with his foot as he scaled the fence.

> Conley's testimony that he scaled the fence "within seconds" of seeing Brown go over the fence, and that he scaled the fence in the same location as Brown does not square with the testimony of Cox, Walker, and Brown. Conley's version of the events provides for no reasonable gap in time during which he could have missed observing Cox at the fence. *Indeed, Conley concedes that if the Cox/Walker/Brown version is true, he would have seen Cox at the fence. In reaching its verdict, the jury apparently found the Cox/Walker/Brown version more credible.*

*Conley I*, 186 F.3d at 19–20 (alteration in original) (emphasis added) (internal citations omitted).

## B. The *Brady* Material in Question

The instant Motion to Set Aside Conviction Under Section 2255 was filed on May 18, 2001, and claimed, *inter alia*, that "newly discovered [exculpatory] evidence" had previously been withheld by the government, and that the government's failure timely to disclose that evidence constituted a *Brady* violation. Subsequent to Conley's conviction and sentencing, defense counsel learned that the government had failed to produce potentially exculpatory evidence in the government's possession. The government now concedes that the evidence ought have been turned over to the defense.

Although the government has argued that "subsequent proceedings have fleshed out that Conley's *Brady* claim is that four pieces of non-disclosed evidence would have impeached Walker's credibility," Resp't Mem. [Doc. No. 27] at 9, the claim

is not so limited. The *en banc* majority in *Conley IV* ruled that this Court must analyze "all of the items of supposed new evidence" under the *Brady* doctrine, considering their "significance" with respect to "whether the *Brady*-qualifying items of new evidence (taken together) undermine confidence in the verdict." 323 F.3d at 15. Indeed, the limitations on "subsequent proceedings" urged by the government apparently stem only from Judge Torruella's dissent, but this Court, of course, is bound by the mandate of the majority.

Listed below is the inventory of *Brady* evidence that Conley argues warrants relief. Items labeled "1" through "8" were part of 246 pages of previously undisclosed material originally submitted to the district court for *in camera* inspection.

### 1. Walker's Internal Affairs Division Testimony

During the summer of 1999, defense counsel obtained the previously-undisclosed transcript of an interview with Walker conducted on March 27, 1995, by the Boston Police Internal Affairs Division ("IAD"). Pet'r App. of Exs. [Doc. No. 29], Ex. 18. Therein, IAD asked Walker to review a series of photographs and identify the two white officers he claimed to have encountered at the bottom of the hill on Woodruff Way. *Id.* at 22. Walker identified photographs of two officers—Joseph Teahan and Michael DeStephano—but he did add that he was "not sure about these photographs." *Id.* at 23–25. Conley also argues that, in the same portion of Walker's testimony, Walker "suggested that the two officers he encountered at the bottom of the hill may have arrived there long after Brown jumped the fence and fled the scene," Pet'r Opening Br. [Doc. No. 28] at 109, but the substance of Conley's argument is unclear.

### 2. Joint Federal–State Investigation of Brown

At trial, defense counsel impeached Brown with his arrests and convictions, including an arrest for state narcotics offenses that had occurred after Brown's grand jury testimony. Trial Tr. II at 144–53. The government elicited testimony from Brown suggesting that he had not committed drug offenses following his grand jury testimony. *Id.* at 154–58. Conley argues that the inference the government sought to have the jury draw was that the offenses had been trumped up by the Boston Police Department in retaliation for Brown's cooperation in the Cox investigation. Trial Tr. IV at 70–71.

In December 1999, defense counsel learned that Brown had been indicted for drug offenses pursuant to a joint federal-state investigation that was ongoing at the time of trial. Pet'r App. of Exs., Ex. 4A ¶ 23. The relevant cocaine sales for which he was indicted took place after he testified before the grand jury but before Conley's trial.

### 3. The FBI Memorandum

An FBI Memorandum dated April 9, 1997 (the "FBI Memo"), contains a request for authorization to have Walker submit to a polygraph examination before trial. Pet'r App. of Exs., Ex. 21. The FBI Memo indicates that Walker had expressed some uncertainty about his recollection of what occurred during the incident in question and that he agreed to take a polygraph examination. *Id.* at 2. It states that "Walker also suggested that perhaps if he was hypnotised [sic] he might truly recall what was going on versus what he indicates was tunnel vision." *Id.* The FBI Memo contains a hand-written note indicating that Walker's attorney subsequently told the FBI that Walker

would not be taking the polygraph. *Id.* at 1. Walker did not take the test.

The FBI Memo also presents what the government argues is information defense counsel had at trial, but chose not to exploit. Specifically, it states that Walker's present recollection was that he did not see anyone running behind Cox toward the fence. During a previous IAD interview (properly disclosed to defense counsel prior to trial), Walker had stated that he had seen someone behind Cox, but could not identify the person or give a description other than to say it was a police officer. The FBI Memo further states that Walker's explanation for the later change in his testimony was that he felt compelled during the IAD interview to say that he saw something. *Id.* at 2. "He felt this way because he knows [Cox] and likes [Cox]" and "felt bad that he could not say what happened and therefore convinced himself that he actually saw someone or something." *Id.*

### 4. Walker's Form 26 Report (the "Skeletal Report")

Prior to Walker's initial IAD interview, IAD requested that Walker submit a report regarding the incident. Walker filed a brief, five-sentence report in response. Pet'r App. of Exs., Ex. 22. The report contained few of the details Walker subsequently recounted at the IAD interview and later at trial.

### 5. The Foley Memorandum

Another document contained in the *in camera* submission was a memorandum written by Lieutenant Kevin D. Foley ("Foley") several days after the beating (the "Foley Memo"). Pet'r App. of Exs., Ex. 23. Foley was Commander of the Anti–Gang Unit of which Cox was a member. Foley therein described events that occurred on Woodruff Way, including a

statement that Officers Gary Ryan and Thomas Teahan came upon Cox lying on his back on a patch of ice as they were "returning to their motor vehicle." *Id.* at 2.

### 6. Walker's Unit Incident History Log

Also withheld during trial was Walker's Unit Incident History Log (the "Incident Log"), which is a computerized contemporaneous log generated by the police dispatcher summarizing Officer Walker's activities on January 25. Pet'r App. of Exs., Ex. 24. The Incident Log contained some information about Walker's activities prior to the incident at Woodruff Way that conflicted with Walker's own Activity Log, which he prepared that night.

### 7. The Booking Reports

The government also turned over subsequent to trial the booking reports for the four shooting suspects apprehended on Woodruff Way. An entry on Brown's booking sheet indicated that he was not injured at the time of his arrest. Pet'r App. of Exs., Ex. 26.

### 8. The Other Form 26 Reports

The government had also withheld forty Form 26 reports prepared by other officers in connection with the incident. Conley's report was three pages and, according to Conley, was among the most detailed of those submitted. Pet'r App. of Exs., Ex. 6.

## V. ANALYSIS

### A. The Legal Framework

■ The Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The government's duty extends to circumstances in which it failed to volunteer exculpatory evidence never requested or requested only in a general way. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In this case, the government concedes that it had a duty to turn over the information and documents in question.[8]

■ Therefore, the question presented is whether the evidence is material. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (internal quotations omitted). Significantly, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). To constitute "reasonable probability," "it is enough to show that the evidence undermines confidence in the verdict." *Conley IV,* 323 F.3d at 10.

### 1. Conley's "Analytical Approach"

In his Opening Brief, Conley fleshes out an interesting—but not persuasive—analytical approach for the Court in this case. The legal standards of materiality as defined by the Supreme Court are not in dispute, but the same cannot be said for the theoretical framework advanced by Conley. Both sides concede that this Court must determine whether the *Brady* evidence in question is sufficient to undermine confidence in the jury's verdict. Conley, however, argues that, in order for this Court to determine whether its confidence is shaken by the *Brady* evidence, the Court must first determine the soundness of the jury's verdict itself. In other words, Conley contends that the Court must review the trial record to determine the

quantum of *Brady* evidence needed to *undermine* confidence in that verdict. To the extent review of the trial record leaves the Court with strong confidence that the government's case was overwhelming and properly tried, that the defense was consistently vigorous, and that the jury's verdict represented a reasoned consideration of the merits, then one would expect that only the most compelling *Brady* evidence would be sufficient to shake that confidence. On the other hand, to the extent the Court concludes that the prosecution was shaky, that it involved considerations other than the defendant's own guilt or innocence, that it relied upon extraneous and highly prejudicial information, and that it was abetted by improper argument at trial not effectively checked by the trial judge or the de-

---

8. This is an appropriate concession insomuch as, in this District, the government has a sorry record stretching back at least a decade of failing to make the disclosures required by law. *See, e.g., United States v. Coppola,* No. 03–10289 (D. Mass. filed Aug. 27, 2003); *United States v. Rodriguez,* No. 01–10206 (D. Mass. filed June 20, 2001) (Wolf, J.); *United States v. Diabate,* 90 F.Supp.2d 140, 150–51 (D.Mass.2000) (Wolf, J.); *Barone v. United States,* No. 98–11104 (D. Mass. filed June 5, 1998) (Wolf, J.); *United States v. Mannarino,* 850 F.Supp. 57, 72 (D.Mass.1994) (Woodlock, J.). These institutional lapses have caused no end of trouble in the fair adjudication of criminal cases. The Court must make plain, however, that its disapproval of the government's conceded and extensive lapses in this case has in no way influenced its evaluation of the materiality of the data improperly withheld.

fense, then in that context one might consider a lesser potency of *Brady* evidence as sufficient to undermine "confidence" in a verdict that was only marginal to begin with.

Pet'r Opening Br. at 4.

For support of this analysis, Conley cites a single, but relevant, Supreme Court decision and a district court decision from this District. In *Agurs*, the Supreme Court stated that

> the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evince [sic] is considered, there is no justification for a new trial. On the other hand, *if the verdict is already of questionable validity*, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

427 U.S. at 112–13, 96 S.Ct. 2392 (emphasis added) (internal footnote omitted). The Court postulated:

> If, for example, one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness. But if there were fifty eye witnesses, forty-nine of whom identified the defendant, and the prosecutor neglected to reveal that the other, who was without his badly needed glasses on the misty evening of the crime, had said that the criminal looked something like the defendant but he could not be sure as he had only had a brief glimpse, the result might well be different.

*Id.* at 113 n. 21, 96 S.Ct. 2392 (quoting Comment, *Brady v. Maryland and the Prosecutor's Duty to Disclose*, 40 U. Chi. L.Rev. 112, 125 (1972)) (internal quotation marks omitted); *see also United States v.*

*Sheehan*, 442 F.Supp. 1003, 1008–09 (D.Mass.1977) (Freedman, J.).

Some *a priori* evaluation of the verdict appears necessary, given the First Circuit's admonition that "[t]he government's evidence at trial was assuredly adequate for conviction, but it was always circumstantial because no one testified that he or she *saw* Conley looking at Cox in pursuit of Brown and Conley never admitted seeing him." *Conley IV*, 323 F.3d at 16. Indeed, the Circuit Court described the inferences for this case as "depend[ing] importantly on testimony as to the position of different actors at different times in a confused and changing scene in the dark of night." *Id.* Whether such guidance from the Supreme Court and the First Circuit contemplates consideration of the entirety of Conley's criticisms of the record, however, is not clear.

Conley posits that "extraneous and prejudicial evidence and argument" likely improperly influenced the jury's verdict. Specifically, Conley alleges six ways in which "prejudicial" or "extraneous" evidence and argument may have corrupted the verdict, such that the Court's confidence in the jury's findings should already be "shaky."

First, Conley argues that the prosecution improperly characterized Conley's assertion of his rights and his acceptance of immunity. The government introduced evidence that Conley had asserted his Fifth Amendment rights and accepted immunity prior to testifying before the grand jury. Conley does not contest the fact of the assertion or the acceptance of immunity; rather, Conley argues that the government adduced the evidence and argued it in such a way to suggest that Conley had something to hide and was a constituent brick in the "blue wall of silence." Conley maintains that he only asserted his rights

and accepted immunity because his attorney advised him to do so, but the government "layered inferences of incrimination, reluctance, and concealment." Pet'r Opening Br. at 62. Significantly, the jury received no limiting instruction regarding how to consider Conley's assertion of his rights.

Second, Conley argues that the cumulative effect of excessive evidence portraying Cox's beating prejudiced the jury. Because Conley was not charged with beating Cox, much of the evidence depicting Cox's beating subjected Conley to unfair prejudice, he asserts.

Moreover, one of the government's "themes" was to portray Conley as attempting to obfuscate his role or knowledge of the night in question. Conley claims that the government accordingly attempted improperly to offer evidence that Conley failed to prepare a report of his "arrest" of Brown. Conley has submitted affidavits of former commanding police officers that when, as here, a police officer is called in to "assist," he is under no obligation to file a report. Conley testified consistent with this "policy," but contends that the government improperly characterized the fact that he did not prepare a report as a "failure."

Additionally, Conley maintains, the government suggested that his failure to complete a report somehow contributed to Brown's homicide acquittal. Brown was acquitted of the underlying homicide charge and Conley never testified at his trial. In closing, the government argued that

> you don't need to know regulations or have any regulations before you to know, common sense, that a police officer who is involved in the capture of a fleeing suspect from a serious crime ought to make a record of that or make somebody know that in fact he's the

witness who should testify. And in fact he didn't testify at the state trial of Robert Brown, the trial in which Robert Brown was acquitted.

Trial Tr. IV at 36. Conley argues that such suggestions unfairly prejudiced him.

Conley also argues that the government improperly elicited testimony from Brown that he had been the subject of retaliation by the Boston Police Department for the cooperation he provided in connection with the Cox grand jury investigation. This, too, Conley argues, caused him to be prejudiced unfairly.

Finally, Conley states that he was prejudiced by the trial judge's decision to allow jurors to use a ruler during deliberations. Somewhat dubiously, Conley maintains that, because the demonstrative exhibits submitted were not drawn to scale, use of the ruler may have prejudiced him.

The government, of course, flatly rejects this "analytical approach" as a thinly-veiled attempt to poison the well of appropriately detached habeas review, and—although its procedural arguments are not relevant here—its substantive arguments are meritorious.

The government contests consideration of this independent "prejudicial" evidence and argument as violative of section 2255 procedure. Specifically, in its reply brief, the government argues that these issues were raised neither on direct appeal nor in the habeas litigation (either in the district court or on appeal). Although the government objects to the "framework" as an attempt to "backdoor" new claims that are already forfeited or waived, the government's procedural objections are not correctly framed. Conley is not expressly attempting to raise new claims for independent consideration; rather he is trying—impermissibly—to stretch the meaning of the Supreme Court's and the First

Circuit's guidance on the issue of materiality.

While consideration of the entire record must precede any reasonable materiality analysis, such consideration does not include deliberation about the inevitably myriad ways in which a petitioner might subsequently attack the integrity of the jury's verdict. That is, while consideration of the circumstantial nature of the instant case is critical, this Court does not engage in sweeping speculation about how the jury may or may not have been influenced "improperly" by the inherent vicissitudes of a trial. The First Circuit's fresh look mandate is not an invitation to perform an unmitigated dissection of the evidence adduced, trial strategies adopted, rulings rendered, and inferences gleaned. Rather, this Court's responsibility is to determine whether there is a reasonable probability that the withheld evidence in question— had it been available to defense counsel— would have led to such an undermining of the government's case that this Court no longer has confidence in the jury's verdict. In other words, this Court ought not engage in a "sufficiency of the evidence" redux under the guise of a *Brady* analysis.

Of course, at the end of the day, the materiality analysis is so case and fact specific, it may be difficult to conduct such a finely-parsed examination de facto. This Court, however, strives for such theoretic discipline.

## B. Applying the Legal Framework

### 1. The Sockdolager [9]

■ For me, the sockdolager is the FBI memorandum (item 3, above). To understand why, it is necessary to recall what defense counsel knew prior to trial——

Cox was an extraordinarily sympathetic victim—a Boston police officer struck down in the line of duty, viciously beaten and permanently injured by fellow officers. With the government seeking to portray Conley as covering up for these officers, a confrontational cross examination of Cox was not indicated and manifestly would have been improper.

Walker, a fellow black officer, was obviously a critical witness. He professed to remember a number of details about the incident, some—such as Conley's position down the hill where he arrested Brown— were helpful to Conley as tending to show he continued in pursuit and did not remain at the fence observing other officers beating Cox. Moreover, defense counsel knew from the properly and timely produced grand jury testimony of Walker that he had gone so far as to embellish details in an understandable, if highly improper, attempt to help Cox, whom he liked. In his grand jury testimony, Walker stated that he "conjur[ed] up pictures" of what he "should have seen" that night because Walker "started feeling guilty" that he did not see more than he did. Pet'r App. of Exs., Ex. 28 at 54. This Court thus acknowledges that defense counsel already had significant ammunition with which he could have impeached Walker for bias.

Defense counsel was thus faced with a nuanced tactical choice. He could well have impeached Walker with his known instances of improper embellishment, but would inevitably have faced the government riposte that Walker had laudably given complete testimony and ought be considered credible because he had included the details favorable to Conley. The quantum of data provided by Walker

9. *See, e.g., Camacho v. Puerto Rico Ports Auth.*, 369 F.3d 570, 572 (1st Cir.2004); *United States v. Santos*, 357 F.3d 136, 143 (1st Cir.2004); *United States v. Caraballo–Cruz*, 52 F.3d 390, 393 (1st Cir.1995); *United States v. Meyer*, 808 F.2d 912, 917 (1st Cir.1987).

would largely have remained, challenged only by Walker's willingness to exaggerate details. Moreover, such impeachment ran the risk of impugning Walker's sympathy for Cox, a sympathy that is palpable throughout the trial record.

What defense counsel did not know was that Walker was so unsure of his memory of the event that he was suggesting he be hypnotized in order to provide relevant detail. To me, this is critical information, for it opens up an entirely new line of cross examination—ability to recall—that puts Walker's entire testimony at issue without in any way faulting Walker's natural sympathy for his injured colleague. Indeed, armed with the hypnotism suggestion, defense counsel could well first have undermined Walker's ability to recall at all with questions that supported his commendable desire to help in the face of a wholly inadequate memory, working in his willingness even to be hypnotized (a medium dependant on suggestibility on the part of the hypnotizer), and then going on to point out that Walker had gone so far as to embellish details out of whole cloth. This would have been a far more attractive course (and could have produced a significantly more searching cross examination) than the choice facing defense counsel wrongfully deprived of this information, as it would be grounded in Walker's admitted frustration with his inability to recall important and relevant details.

Nor is this some *a priori* stretch of my imagination as a trial judge.[10] The considered judgment of bench, bar, and scholars supports such an approach and confirms its utility. Consider:

Defense counsel Willie Davis, Esq. is an outstanding trial lawyer, thorough in preparation, deft in cross examination, and tenacious in representing his clients. He has practiced before me continuously and professionally since his appearance for the defendant in *Commonwealth v. Wills,* Norfolk Sup.Ct. Nos. 79304, 79305, *aff'd,* 398 Mass. 768, 500 N.E.2d 1341 (1986).[11] Of him it may be said (as General Lee said of Meade upon learning he had replaced Hooker), "He will make no mistake on my front, and if I make one he will be quick to take advantage of it." *The Civil War: A Film by Ken Burns* (PBS television broadcast, 1990).[12]

Moreover, the mention of a need for hypnotism as a memory enhancer would have an especial and pejorative resonance with the jury. Hypnotism has yet to gain widespread acceptance in the scientific community and has been treated with uniform skepticism by the courts when ad-

---

10. Perhaps it is appropriate to point out here that I have continuously taught trial practice or advanced trial practice for 36 years at one or more of the following schools: Boston College, Boston University, and Harvard Law School. I have been a trial judge in state and federal courts for over a quarter century.

11. *See also United States v. Adewale,* No. 02–10007 (D. Mass. filed Jan. 11, 2002); *United States v. Harris,* No. 98–10234 (D. Mass. filed July 30, 1998); *Duarte v. DiPaolo,* No. 98–10745 (D. Mass. filed April 30, 1998); *Cox v. Conley,* 98–10129 (D. Mass. filed Jan. 23, 1998); *Cox v. City of Boston,* No. 95–12729 (D. Mass. filed Dec. 18, 1995); *Barrons v. Pepe,* No. 94–10061 (D. Mass. filed Jan. 13,

1994); *United States v. McGee,* No. 92–10202 (D. Mass. filed July 15, 1992); *United States v. Keliher,* No. 90–10269 (D. Mass. filed Dec. 17, 1990).

12. For the propriety of such personal reflections, see *United States v. Amaya–Manzanares,* 377 F.3d 39, 45–46 (1st Cir.2004), and *id.* at 49 (Torruella, J., dissenting) ("The experienced trial judge that decided to exclude [the evidence] in this case, himself a former federal prosecutor, was surely fully cognizant of the unfair prejudice to defendant lurking in this evidence, and properly exercised his discretion in excluding it as irrelevant and unnecessary.").

vanced as an evidentiary tool. As the Supreme Court has observed, "[t]hree general characteristics of hypnosis may lead to the introduction of inaccurate memories:"

> the subject becomes *"suggestible"* and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to *"confabulate,"* that is, to fill in details from the imagination in order to make an answer more coherent and complete; and, the subject experiences *"memory hardening,"* which gives him great confidence in both true and false memories,

making effective cross-examination more difficult.

*Rock v. Arkansas,* 483 U.S. 44, 59–60, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (emphasis added) (rejecting as unconstitutional a *per se* rule excluding *defendant's* hypnotically-refreshed testimony). Finding the technique inherently unreliable, many jurisdictions adopt the presumption that hypnotically-enhanced testimony is inadmissible.[13] As is often the case, the uniform judicial suspicion of the use of hypnotism as an investigative tool reflects the general public attitude. The jury here would likely share this attitude.

**13.** *See, e.g., Contreras v. State,* 767 P.2d 1169 (Alaska Ct.App.1989); *State ex rel. Collins v. Superior Court of Maricopa County,* 132 Ariz. 180, 644 P.2d 1266 (1982); *People v. Shirley,* 31 Cal.3d 18, 181 Cal.Rptr. 243, 723 P.2d 1354 (1982) (partially abrogated by Cal. Evid. Code § 795 (West 1995 & Supp.2003)); *State v. Atwood,* 39 Conn.Supp. 273, 479 A.2d 258 (1984) (overruled in part by *Rock v. Arkansas*); *State v. Davis,* 490 A.2d 601 (Del.Super.Ct.1985); *Stokes v. State,* 548 So.2d 188 (Fla.1989); *Walraven v. State,* 255 Ga. 276, 336 S.E.2d 798 (1985); *State v. Moreno,* 68 Haw. 233, 709 P.2d 103 (1985); *People v. Zayas,* 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d 513 (1989); *Odem v. State,* 483 N.W.2d 17 (Iowa Ct.App.1992); *Peterson v. State,* 448 N.E.2d 673 (Ind.1983); *State v. Haislip,* 237 Kan. 461, 701 P.2d 909 (1985); *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983); *Commonwealth v. Kater,* 409 Mass. 433, 567 N.E.2d 885 (1991); *People v. Lee,* 434 Mich. 59, 450 N.W.2d 883 (1990); *State v. Mack,* 292 N.W.2d 764 (Minn.1980); *State v. Blackman,* 826 S.W.2d 76 (Mo.Ct.App. 1992); *State v. Palmer,* 210 Neb. 206, 313 N.W.2d 648 (1981); *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983); *State v. Peoples,* 311 N.C. 515, 319 S.E.2d 177 (1984); *Harmon v. State,* 700 P.2d 212 (Okla.Crim.App.1985); *Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981); *Commonwealth v. Taylor,* 294 Pa.Super. 171, 439 A.2d 805 (1982); *State v. Tuttle,* 780 P.2d 1203 (Utah 1989); *Hall v. Commonwealth,* 12 Va.App. 198, 403 S.E.2d 362 (1991) 1 *State v. Martin,* 101 Wash.2d 713, 684 P.2d 651 (1984); *State v. Beard,* 194 W.Va. 740, 461 S.E.2d 486 (1995).

Some courts have adopted a case-by case approach to the admissibility of hypnotically-enhanced testimony, either adopting procedural safeguards, *see, e.g., House v. State,* 445 So.2d 815, 826 (Miss.1984); *State v. Hurd,* 86 N.J. 525, 432 A.2d 86, 96–97 (1981); *State v. Adams,* 418 N.W.2d 618, 624 (S.D.1988), or applying a "totality of the circumstances" test that balances the testimony's reliability and probative value against its prejudicial effect, *see, e.g., Mersch v. City of Dallas,* 207 F.3d 732, 735–36 (5th Cir.2000); *Borawick v. Shay,* 68 F.3d 597, 607 (2d Cir.1995); *Bundy v. Dugger,* 850 F.2d 1402, 1414–20 (11th Cir. 1988); *United States v. Kimberlin,* 805 F.2d 210, 219 (7th Cir.1986); *Harker v. Maryland,* 800 F.2d 437, 442–43 (4th Cir.1986); *Sprynczynatyk v. Gen. Motors Corp.,* 771 F.2d 1112, 1123 (8th Cir.1985); *People v. Romero,* 745 P.2d 1003, 1017 (Colo.1987); *State v. Iwakiri,* 106 Idaho 618, 682 P.2d 571, 578 (1984); *State v. Commeau,* 438 A.2d 454 (Me.1981); *State v. Hungerford,* 142 N.H. 110, 697 A.2d 916, 925–27 (1997); *State v. Johnston,* 39 Ohio St.3d 48, 529 N.E.2d 898, 906 (1988).

Only a handful state courts presume that hypnotically-enhanced testimony is admissible, treating it as an issue of credibility rather than competence. *See, e.g., Roark v. Commonwealth,* 90 S.W.3d 24, 36 (Ky.2002); *State v. Brown,* 337 N.W.2d 138, 151 (N.D.1983); *State v. Jorgensen,* 8 Or.App. 1, 492 P.2d 312, 315 (1971); *State v. Glebock,* 616 S.W.2d 897, 903 (1981); *Prime v. State,* 767 P.2d 149, 153 (Wyo.1989).

Then too, cross examination to demonstrate lack of recollection is recognized as an entirely different tack—with different skills and techniques—from cross examination to demonstrate bias. Indeed, it is a fundamental principle of effective trial advocacy that impeachment for inability to recall is a significant cross-examination technique, separate and apart from impeachment for bias. *See, e.g.,* Roger Haydock and John Sonsteng, *Trial Advocacy Before Judges, Jurors and Arbitrators* 535–36, 541 (West Publishing Group 2d ed.1999) (stating that "[b]ias and prejudice are factors which prevent a witness from being impartial," while "[s]ome witnesses might not actually recall what they say they observed or perceived"); Steven Lubet, *Modern Trial Advocacy Analysis and Practice* 157 (National Institute for Trial Advocacy 1993) (stating that "the concept of impaired recollection involves the occurrence of intervening event damaging to the witness's recall [such as] the mere passage of time"); Peter Murray, *Basic Trial Advocacy* 192–93 (Little, Brown and Co.1995) (noting that impeachment techniques include challenging *"both* the witness's opportunity and ability to render accurate testimony [recall] and the witness's motive to do so [bias]"); L. Timothy Perrin, H. Mitchell Caldwell, & Carol A. Chase, *The Art & Science of Trial Advocacy* 327 (Anderson Publishing Co.2003) ("The third impeachment possibility [after bias and failure to perceive] is a failure of the witness' memory. By showing that the witness has forgotten important facts, *the lawyer calls into question other parts of the witness' testimony that the witness claims to remember and raises doubts about the witness' certainty of the witness' testimony.*" (emphasis supplied)).

Generally, the government responds that to take the tack outlined above would require Conley to "disavow the theory of defense he embraced at trial." Resp't Reply Mem. [Doc. No. 149] at 31; *see also* Resp't Mem. at 21–23. The government and Judge Torruella in his dissent in *Conley V,* 323 F.3d at 31 (Torruella, J., dissenting), argue that undisclosed evidence that might have been used to impeach Walker's credibility in general is immaterial under *Brady* because the defense actually sought to embrace Walker's testimony at trial. The defense pursued this strategy because Walker placed Conley at the bottom of the hill, away from the scene of the beating. Indeed, in closing, defense counsel argued that the tall, white officer identified by Walker had to be Conley. Therefore, contends the government, all of the withheld evidence that might have impeached Walker would not have been used.

This Court respectfully rejects this argument virtually out of hand. As a matter of multidimensional trial strategy, it would have been quite possible for experienced defense counsel to argue—as Mr. Davis here sought to do—that Walker should be believed on certain issues, such as what he said he did not see at the scene, *and* simultaneously to challenge Walker's ability to perceive or recall. It simply will not do for the government to admit that it had a duty during discovery to deliver a three legged stool [Walker's earlier substantive statements, his grand jury testimony revealing bias, *and* the FBI memo revealing lack of memory] and then to complain that defense counsel precariously tried to balance on a two legged stool instead of grasping the bias leg and trying to smash the stool outright. It is precisely this "damned if you do, damned if you don't" approach that this Court sought to address in its nationally acclaimed expansive Local Rules concerning discovery in criminal cases. *See e.g.,* Illinois Capital Punishment Commission Report, Recommendation 49, at 119–20, and chapter 8 of the technical appendix, *available at* http://

www.idoc.state.il.us/ ccp/ccp/reports/techinical_appendix/reasearch_report.html (last visited August 3, 2004).[14] Discovery issues are, of course, always best addressed pre-trial. *See Daughtry v. Dennehy*, 946 F.Supp. 1053, 1059 n. 2 (D.Mass. 1996) ("[After trial], given the very nature of the adversary process, neither the government nor the defense, much less this Court, can say with any real certainty what ultimately will prove material. In the pre-trial situation, . . . materiality is largely in the eye of the beholder. [This Court's prior pre-trial discovery orders] seek to make sure some eye other than the government's will bear on that determination.").[15]

■ In any event, after considerable reflection, this Court holds that the wrongful withholding of the FBI memorandum with its significant data bearing on Walker's inability to recall crucial events so undermines confidence in the jury's verdict as to constitute "material" evidence.[16] The writ of habeas corpus must therefore issue.

**14.** The URL does in fact misspell "technical" as "techinical" and "research" as "reasearch."

**15.** Addressing discovery issues prior to trial has the advantage of avoiding the sticky "what if" question:

[The Supreme] Court has adopted no fewer than four assertedly different standards of probability relating to the assessment of whether the outcome of trial *would* have been different *if* error had not occurred, or *if* omitted evidence had been included. See *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (adopting "harmless beyond a reasonable doubt" standard for preserving, on direct review, conviction obtained in a trial where constitutional error occurred); *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (rejecting *Chapman* in favor of the less defendant-friendly "'substantial and injurious effect or influence'" standard of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), for overturning conviction on collateral review); *United States v. Agurs*, 427 U.S. 97, 111–113, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (rejecting *Kotteakos* for overturning conviction on the basis of *Brady* violations, in favor of an even less defendant-friendly standard later described in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as a "reasonable probability"); *id.* at 693–694, 104 S.Ct. 2052 (distinguishing the "reasonable probability" standard from the *still yet* less defendant-friendly "more likely than not" standard applicable to claims of newly discovered evidence). See generally *Kyles v. Whitley*, 514 U.S. 419, 434–436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Such ineffable gradations of probability seem to me quite beyond the ability of the judicial mind (or any mind) to grasp, and thus harmful rather than helpful to the consistency and rationality of judicial decisionmaking. That is especially so when they are applied to the hypothesizing of events that never in fact occurred. Such an enterprise is not factfinding, but closer to divination. *United States v. Dominguez Benitez*, —— U.S. ——, 124 S.Ct. 2333, 2342, 159 L.Ed.2d 157 (2004) (Scalia, J., concurring).

**16.** The Court's holding is not based in any way on the suggestion that a polygraph examination be administered to Walker. There is no rule that such evidence is *per se* inadmissible, *see United States v. Tokars*, 95 F.3d 1520, 1536 n. 10 (11th Cir.1996); *Underwood v. Colonial Penn. Ins. Co.*, 888 F.2d 588, 590 (8th Cir.1989), and the First Circuit continues to avoid the issue, *deVries v. St. Paul Fire and Marine Ins. Co.*, 716 F.2d 939, 944–45 (1st Cir.1983) (holding that where district court had acted within its discretion in excluding polygraph results, there was no need to address the issue of whether there is a *per se* rule of exclusion of polygraph evidence in federal court). (The government improperly cites *deVries* and conflates the First Circuit's holding that the district judge did not abuse its discretion in excluding polygraph evidence with a holding that such evidence is inadmissible—a question the First Circuit expressly reserved.) Still, this Court has no hesitancy in concluding that the amendments to Federal Rule of Evidence 702 make it highly unlikely that polygraph results would ever have been received in evidence in this case.

## 2. Best evidence in a supporting role.

Conley contends that the booking reports contained evidence that would have impeached Brown's credibility. The booking reports, prepared by a booking officer and signed by Brown, indicate that Brown did not suffer any injuries at the time of his arrest. Yet Brown testified at trial that he "split [his] tooth in half" when he ran into a tree after jumping the fence. Trial Tr. II at 97. Brown said that he "sat there for a minute because [he] was in pain." *Id.* Indeed, Brown's broken tooth was the only explanation offered by Brown regarding why he lingered after jumping the fence.

The government did not respond to this argument in its memoranda.

Since pain from a chipped or broken tooth is a common human tribulation, and since the booking officer would appear to the jury as a more indifferent—and therefore neutral—figure, Brown's signature on the booking report that he suffered no injury adds gravitas to the other extensive impeachment of Brown. Standing alone, however, this Court would not grant the writ due to the nondisclosure of this evidence. Even so, the failure to disclose this evidence does tend to reinforce and confirm the propriety of this Court's holding based on the FBI memorandum.

## 3. The other non-disclosed evidence

The remaining evidence that the government failed to disclose does not amount to much. Consideration of this evidence does not make this Court any more disposed to issue the writ of habeas corpus than it would have been absent such consideration. Still, because further proceedings may well be in the offing, and because the First Circuit's "fresh look" mandate requires a thorough review of all the evidence, this Court considers each item separately and all of them together.

### a. Walker's IAD Testimony

During his first interview with IAD, Walker identified photographs of officers Teahan and DeStephano as possibly being the officers he encountered at the bottom of the hill. Conley argues that such an identification "could have cast further doubt on the accuracy of Walker's recollection offered at trial." Pet'r Opening Br. at 89. Presumably, Conley might have argued at trial that Walker's identification of those officers—who were in fact not at the bottom of the hill—demonstrated his faulty memory, that is, it may have cast doubt on his credibility in general.

Neither Walker nor the government, however, ever suggested that Walker could identify Conley as the tall, white officer he saw. Walker asserted his uncertainty about the identification saying, "[l]ike I said, I'm not sure about these photographs but it looks like the tall officer." Pet'r App. of Exs., Ex. 18 at 25. Indeed, it was totality of the circumstances, corroborated by Conley's own testimony, that established that Conley was that officer. The defense was already aware of Walker's inability to identify the tall, white officer at the bottom of the hill. *See* J.A. at 269–70, 272, 275, 285, 292, 296 (Walker repeatedly and mistakenly referring to the tall officer as Gary Ryan). *Brady* does not protect a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue. *See United States v. Hicks*, 848 F.2d 1, 4 (1st Cir.1988). Therefore, this evidence does not contribute to an undermining of the verdict.

### b. Joint Investigation of Brown

The fact that a *joint* federal-state investigation of Brown was ongoing, Conley argues, could have been used to impeach

Brown's credibility when he testified at trial that he had not committed any drug offenses in the months following his grand jury testimony.[17] Conley argues that this information may have blunted the government's argument that Brown was the victim of police retaliation because the fact that the federal government was also investigating him would tend to show that the charges were not trumped up. Even assuming that it would have been appropriate to permit defense counsel to cross-examine Brown on the subject, *see Conley II*, 103 F.Supp.2d at 54 (stating that "it is questionable whether it would have been appropriate in applying [Federal Rules of Evidence] 404, 404(b) and 608(b) to permit defense counsel to cross-examine Brown on the federal drug investigation against him"), the government's "theme" that Conley seeks to attack is not central here. Indeed, the government never articulated this argument of retaliation; it merely argued that, given Brown's subjective belief that his role as a government witness hurt, rather than helped, him with the Boston Police Department, he had no motive falsely to incriminate Conley. Moreover, Brown was cross-examined by way of his extensive criminal record, including prior drug convictions. The evidence does not serve to contribute to a subsidence of the verdict.

#### c. Walker's Form 26 Report

The dispute about Walker's Form 26 Report is essentially simple. Conley contends that because Walker was asked by IAD "to complete a report *completely* detailing [his] knowledge of the allegations," *see* J.A. at 418 (emphasis added), and because Walker did not include any of the details he later imparted to IAD, the re-

port could have been used by Conley to impeach Conley by omission. The government responds (and Judge Torruella agreed in his dissent in *Conley V*, 323 F.3d at 31) that the report was merely "skeletal" and was not intended to constitute a thorough description of events. The fact that Walker met with IAD just days later and gave a highly detailed accounting of what he knew—including the details that conflicted with Conley's testimony and helped form the basis of the perjury conviction—shows that the report was immaterial. Indeed, argues the government, he was ordered to appear before IAD in the same memo in which Walker was instructed to write the report.

Conley, however, also argues that timely disclosure of the report could have assisted defense counsel in rebutting the prosecutor's arguments regarding Conley's failure to file a report in an attempt to bolster the "blue wall of silence" because Walker's report was itself insubstantial. Moreover, because Conley's Form 26 Report was three pages and considerably more detailed, he argues, Walker's Form 26 Report was, in comparison, even more important to the defense. The government suggests in its Reply Memorandum that Walker—unlike Conley—voluntarily submitted a report after the incident in which he documented his presence on the scene, but it is unclear to what the government is referring. Resp't Reply Mem. at 30. The government also responds that it could still have made the argument that Conley initially failed to file a report, notwithstanding the detailed Form 26 Report he later filed.

Notably, Conley does not spend much time fleshing out how important this re-

---

**17.** In his original Motion for a New Trial, Conley claimed that this new evidence showed that Brown committed perjury. The trial judge, however, found that this evidence did not establish that Brown committed perjury, and this ruling was affirmed. *Conley III*, 249 F.3d at 46.

port would have been to impeach Walker, which indicates that Walker and the government have successfully characterized it as a mere precursor to Walker's full statement days later. The Form 26 Report is thus a non-starter.

### d. The Foley Memo

Conley argues that the Foley Memo could further undercut Walker's recollection of the timing of events because Officer Foley indicated that Officers Ryan and Teahan came upon Cox as they were returning to their vehicle and Walker had told IAD that he understood that Ryan was at the bottom of the hill with Teahan. The government argues that the Foley Memo is immaterial because Foley did not state that he had actually spoken to these two officers. This is among the weaker evidence Conley presses, and the Court takes no further notice of it.

### e. Walker's Unit Incident History Logs

Conley argues that Walker's Unit Incident History could have been used to suggest that Walker's recollection of events may have been faulty and could have helped refute the government's argument that Conley arrested Brown. Walker's activity log (which he prepared himself) contains several inconsistencies when compared to the Unit Incident History prepared by the dispatcher. These activities are wholly independent from the events in question, but Conley argues that they tend to indicate Walker's inability to perceive or recall events on that fateful night. The government responds that the alleged "inconsistencies" are trivial and would clearly not have impacted the substantive case.

With respect to the issue of Brown's "arrest," Conley maintains that, because both Walker and Conley were involved in the apprehension of Brown, if Conley was required to file an "arrest" report, so too was Walker; yet the only "arrest" reported on Walker's Unit Incident History was an earlier arrest subsequent to a motor vehicle stop. In other words, Conley argues that this evidence would have bolstered his claim at trial that he was merely "assisting," that he did not make a formal "arrest," and, therefore, no report was required. The government responds that Walker, unlike Conley, did not stop Brown at gunpoint and handcuff him. Generally, the government argues that the exculpatory value of the Unit History Reports is quite attenuated. The government is correct.

### f. Other Form 26 Reports

Finally, Conley states that review of the other Form 26 Reports demonstrates that Conley's "was among the most detailed of those submitted." Pet'r App. of Exs., Ex. 6. Ostensibly, Conley implies that this evidence generally would have bolstered Conley's position at trial that he was truthful, forthcoming, and not a part of the alleged "blue wall of silence."

The government effectively responds that Conley had the Form 26 Reports of some of the officers, including Officers Williams, Burgio, Daley, Horton, Caisey, Stratton, and Ryan, and could have made the same argument he posits here.

### 4. The Cumulative Effect of the Undisclosed Evidence

### a. The Parties' Arguments

■ Withheld evidence, under *Brady*, is "considered collectively, not item by item." *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555. In other words, the Court's duty is not to consider whether any one particular piece of withheld evidence would undermine confidence in the jury's verdict; rather, it

must determine whether the cumulative effect of all the undisclosed evidence causes such a subsidence.

The two principal arguments the government advances in positing that the cumulative effect of the undisclosed evidence is negligible are 1) that the evidence is either tangential or merely cumulative of other impeachment evidence already in Conley's possession before trial; and 2) notwithstanding its weight, Conley would not have used the withheld evidence at trial because the defense theory of the case was to embrace Walker as a credible witness.

With respect to the first argument, Conley responds that the evidence is not merely cumulative. Principally, with respect to the FBI Memo, Conley presses the distinction between Walker's ability to recall—potentially called into question by the FBI Memo—and whether he had fabricated an earlier version of events out of sympathy for his friend, Officer Cox. Conley would argue similarly with respect to Walker's previous IAD testimony and Walker's Form 26 Report.

Furthermore, the government argues that the evidence was only useful for impeachment of Walker on tangential matters. For example, the government says that the FBI Memo was immaterial because Walker's inconsistent statement merely "would have supported the theory that Walker may have seen a figure, namely Conley, closely behind Cox." Resp't Mem. at 31. Additionally, it asserts that Walker's IAD interview was immaterial because "it has virtually no impeachment value for Walker's testimony about his observations of seeing Cox chase a suspect, or, for that matter, for his testimony in general." Id. at 17. Also, the government argues that the Foley memo is immaterial because it does not undermine Walker's

testimony regarding the chase to the fence. Id. at 25.

Conley dismisses these arguments as the government's post hoc attempt to parse the complete trial testimony describing an undisputedly rapid and chaotic series of events. Conley argues that, because the government's case sought to place the entire episode into an "integrated whole," the withheld evidence "could have been used to further elucidate the confusion and 'commotion' that the defense attempted to explore." Pet'r Reply Mem. [Doc. No. 150] at 10. The government cites United States v. Natanel, 938 F.2d 302 (1st Cir. 1991) for the proposition that impeachment evidence relating to an issue not essential to the conviction is immaterial. As Conley points out, however, Natanel involved Rule 33, whose materiality standard is more onerous than Brady's, and, unlike in Natanel, Walker was not already subject to "a series" of impeachments at trial relative to his ability to perceive or recall. Id. at 314.

More importantly, Conley takes issue with the government's contention that defense counsel would not have sought to impeach Walker with any of the withheld evidence—had it been available—because the defense embraced Walker as a credible witness. The government primarily rests on the fact that the defense at trial sought to bolster Walker's credibility because Walker's testimony placed Conley at the bottom of the hill, away from the scene of the beating.

Conley vehemently responds to this argument. In his Opening Brief, Conley states that

in the heat of a jury trial, use of the withheld Walker evidence to test the reliability of Walker's perceptions on certain issues would not necessarily have been inconsistent with adopting Walker as a credible witness as to others.... As

a general matter, a jury may accept all, some, or none of a witness's testimony, and this range of choices certainly could have been presented in this case.

Pet'r Opening Br. at 110 n. 72. Conley correctly rejects the government's "static" view of the defense strategy. That is, Conley asserts that, had defense counsel gained possession of the evidence prior to trial, it may well have attempted a challenge to Walker's ability to perceive or recall the events. Conley submits that defense counsel concomitantly could have challenged Walker's ability to perceive or recall and portrayed him as a credible witness on certain issues. In summary, Conley states that "[c]ertainly the jury could have concluded that Walker *did not* see certain events, as he claimed, while still concluding rationally that his lack of certainty concerning the things *he thought he saw* raised a reasonable doubt." Pet'r Reply Mem. at 12.

### b. Holes in the Trial Testimony

The highly circumstantial nature of the case is troubling. Indeed, having reviewed the record, it appears that the testimony of Cox, Walker, and Brown was not so "interlocking" as the government contends. For example, Cox, Walker, and Brown all testified that Cox was right behind Brown at the fence. Furthermore, they all testified that Brown reached and scaled the fence very quickly, as Cox was unsuccessful in reaching for Brown. Walker says that as soon as Brown tumbled over the other side of the fence, he dashed through an opening in the fence, and, therefore, that is presumably why he did not see Cox being beaten.

Cox and Brown's testimony, however, does not necessarily square with Walker's testimony. First, Cox testified that he was struck from behind immediately following his failed attempt to grab Brown, that is, the beating started only a moment after Brown scaled the fence. Brown testified that he witnessed part of the beating because, upon reaching the other side of the fence, he ran into a tree, which knocked him down and split his tooth. Momentarily dazed, he was able to see Cox being beaten and a tall, white officer staring at him through the fence. This begs the question: what happened to Walker?

Walker said that he went through the fence immediately after Brown jumped over and had his "tunnel vision" trained on Brown. If Brown was stopped on the other side of the fence because of his confrontation with the tree, why didn't Walker immediately nab Brown or at least see Brown "momentarily dazed" if Walker indeed had such tunnel vision? Why didn't Brown see Walker? Moreover, if Cox was hit just after Brown jumped the fence, why didn't Walker see the perpetrator? All of the witnesses testified that everything happened very quickly. If Cox was in Walker's line of vision at least until the point at which Brown jumped the fence, would not Walker *at least* have seen the officer who beat Cox in the immediate area, if not more?

What the government calls "interlocking" testimony may have been sufficient to convict Conley, but obvious temporal lacunae exist among the three witnesses. This alone gives the Court pause as to the strength of this verdict, notwithstanding the *Brady* evidence.

Nevertheless, were it not for the FBI memorandum, this Court would have denied the writ, even considering the variety of undisclosed items taken together.

### VI. CONCLUSION

For all the reasons set forth above, this Court grants the Great Writ of habeas corpus. Unless the government, within sixty days of the date of this Order, moves

for a re-trial, the now pending charges shall be dismissed. Because the government has withheld crucial information, Kenneth B. Conley did not receive a fair trial. Insofar as it is in my power, he shall have one.

SO ORDERED.